Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

LOCAL 1010, UNITED STEELWORK-ERS OF AMERICA, AFL–CIO, CLC, Defendant-Appellee.

No. 80–2438.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1981.

Decided Nov. 16, 1981.

Beate Bloch, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

Daniel B. Edelman, Washington, D. C., for defendant-appellee.

Before SWYGERT and SPRECHER, Circuit Judges, and MARSHALL,* District Judge.

MARSHALL, District Judge.

Plaintiff appeals an order of the district court granting defendant's motion for summary judgment. We hold that the district court had remedial discretion to deny the new election sought by the Secretary in this case and affirm.

This is a suit brought by the Secretary of Labor alleging violations of the election rules of Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* ("LMRDA"), during the April 8, 1976 election of officers of defendant, Local 1010 of the United Steelworkers. The LMRDA directs the district court, if it finds that such violations occurred and if such violations "may have affected the outcome of an election", to declare the challenged election void and direct the conduct of a new election under the supervision of the Secretary. 29 U.S.C. § 482(c)(2).

The district court found that the April 8, 1976 election was held in "blatant" defiance of the LMRDA election rules in two respects. First, unused ballots were burned the day after the election although the statute requires all records pertaining to the election be preserved for one year and second, the voting did not proceed by secret

---

\* The Honorable Prentice H. Marshall, United States District Judge for the Northern District of Illinois, is sitting by designation.

ballot as required by the LMRDA. The district court found, however, that neither violation "may have affected" the election outcome, which is a prerequisite to granting relief under § 482(c), and that, in any event, the court was not required to order a rerun election in the exceptional circumstances of this case in which an incumbent union faction intentionally violated the LMRDA election rules, lost the election, and then complained to the Secretary in an effort to undo the election results.

The Secretary does not appeal the district court's conclusion that the premature destruction of the unused ballots could not have affected the election outcome. The Secretary does appeal the district court's conclusion that the failure to conduct the 1976 election by secret ballot could not have affected the election outcome. The Secretary also urges that the district court was required to reorder a rerun election in this case regardless of who was responsible for the violation of the election rules. The undisputed facts follow.

At the time of the 1976 election there were two rival factions within the defendant local. The incumbent faction was the Official Combined Caucus led by president Henry Lopez. An insurgent faction was the Rank-and-File Caucus led by James Balanoff. Lopez had defeated Balanoff for the presidency of the local in 1970 and again, in a relatively close election, in 1973. Balanoff and Lopez were again the candidates for the presidency in 1976. Rank-and-File Caucus and Official Combined Caucus ran a full slate of candidates in the 1976 election.

Official Combined Caucus under the leadership of Lopez was in charge of the 1976 election and was responsible for the violations which occurred. An election committee of 87 members was chosen by a group of officials dominated by the top officers of Local 1010, all of whom were aligned with the Official Combined Caucus. Only seven members of the 87 members of the election committee were supporters of the Rank-and-File Caucus. Three officers were elect-

ed to run the election committee, all of whom were supporters of the Official Combined Caucus. Martin Connelly, Chairman of the Election Committee, had been a candidate on the Official Combined Caucus slate in 1970 and in 1973. He took full charge of the election, personally appointing election captains for each polling site, all of whom were loyal to the Official Combined Caucus.

On April 5, 1976, three days before the challenged election there was a meeting of the election committee officers and the voting site captains. No members of the Rank-and-File Caucus were present at that meeting. Those present at that April 5 meeting determined that only one voting booth would be provided at each of the eleven or fourteen[1] voting sites, although this was totally inadequate to accommodate the approximately 17,000 members of Local 1010. Because there were insufficient voting booths members voted at tables which permitted voters to look at each other's ballots as they voted. At the time of the 1976 election both Connelly and Lopez knew that federal law required voting to proceed by secret ballot. In fact, the failure to provide private compartments at the polling sites was one reason the February, 1973 election for the Director of District 31, the district of which Local 1010 was a part, had been successfully challenged by the Secretary.

At approximately 1:00 p. m. on election day, April 8, Dale Bronson, a polling site captain, told Balanoff that Balanoff would win the election but added:

Jim, you ain't going to be installed. The election is all screwed up already. We already have plans to go to the Labor Department. A new election is guaranteed.

Later that day Henry Lopez told Balanoff that Balanoff would never sit in the president's chair. Still later that day, Raymond Lopez, the secretary-treasurer of the election committee and Henry Lopez's brother, told Balanoff, "You might get in,

1. There is a conflict in the record as to whether there were eleven or fourteen polling sites.

but you will be out. This election is going to be out."

After the election all election materials were stored with Brink's personnel overnight. The next day ballots were processed initially by union members supervised by the election committee and then delivered to an enterprise with which the Local had contracted to use a computer to count the ballots. The Local's personnel separated the unused ballots from the used ballots and Connelly, who had conferred with Henry Lopez several times on the morning of April 9, 1976, personally made the decision to burn the unused ballots.

Balanoff defeated Lopez by a margin of almost two to one and a number of other candidates running on the Rank-and-File slate defeated Official Combined Caucus candidates.

John Hurley, the complainant in this case, had been a member of the Official Combined Caucus for many years and ran for re-election to the Vice-Chairmanship of the Grievance Committee in 1976. When he was defeated in the April 8 election Hurley consulted Joseph Festa, a staff representative of the United Steelworkers of America, who advised Hurley to express his complaint at the Local's regular meeting. At that meeting on April 15, 1976 Hurley stated that he believed the April 8 election was conducted in violation of federal law. After that meeting Festa drafted a letter which Hurley signed and sent to the Secretary-Treasurer of the United Steelworkers of America. This was in accordance with 29 U.S.C. § 482(a) which requires a member of a labor organization to exhaust his union remedies before filing a complaint with the Secretary of Labor. A second protest letter was sent to the Secretary-Treasurer by the outgoing members of the Local's executive board who were instructed by Lopez to sign a letter of protest which he had already prepared. The content and wording of the Hurley protest letter and the Lopez protest

letter were "in large part absolutely identical." District court opinion at 373.

A hearing was held on June 3, 1976 by a commission established by the United Steelworkers of America at which both Hurley and Lopez spoke about the violations in the election. On July 27, 1976, having waited the statutorily required three months after invoking available union remedies, Hurley filed a complaint with the Secretary of Labor which triggered the instant action.[2]

The district court held that the LMRDA does not require it to order a rerun election where an incumbent union faction intentionally violates the Act, loses the election and then seeks to rely on its own violations to invalidate the election. We affirm this aspect of the district court's opinion.

■ Preliminarily, however, we address two other issues raised by this appeal. First, we reject defendant's suggestion that the case should be dismissed as moot. Under the anti-mootness rule of *Wirtz v. Glass Bottle Blowers Association*, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1967), an intervening union election does not moot the Secretary's challenge to an election. *Glass Bottle Blowers* involved a recurring violation in the form of a rule restricting members eligible to run for union office. However, *Glass Bottle Blowers* has also been applied where the violation does not reoccur in the intervening election since the non-mootness rationale is founded, in part, on the possibility that the victors of the challenged election are improperly in the powerful position of incumbency in the intervening election and, therefore, the second election may also be tainted by the violation. *See, e. g., Wirtz v. Hotel, Motel & Club Employees Union*, 391 U.S. 492, 500 n. 9, 88 S.Ct. 1743, 1748 n. 9, 20 L.Ed.2d 763 (1968).

We see no principled way to avoid the application of *Glass Bottle Blowers* to this case.

---

**2.** The statute requires a union member to exhaust the remedies available under the union constitution and by-laws and to wait three months after invoking such remedies before filing a complaint with the Secretary. The Secretary is not entitled to file suit under § 482 unless a union member files a complaint with him. 29 U.S.C. § 482.

Defendant suggests that we distinguish this case from *Glass Bottle Blowers* on the basis that the Secretary declined an invitation to supervise the 1979 election of the officers of Local 1010. Without passing on the merits of this suggested exception to *Glass Bottle Blowers*, we find it inapplicable here. Our review of the record discloses a factual dispute as to whether such an invitation was made and if so what its terms were. *Compare* Plaintiff's Motion for Leave to Inform the Court of New Developments Affecting the Status of This Action in the Record at 62 with Defendant's Response to That Motion in the Record at 63.

■ We also find it appropriate to express our disagreement with the district court's conclusion that the secret ballot violation could not have affected the outcome of the election. The violation itself established a *prima facie* case that the outcome of the election "may have" been "affected" within the meaning of 29 U.S.C. § 482(c). *Hotel, Motel & Club Employees Union, supra* at 505–509, 88 S.Ct. at 1751–1753; *Brennan v. Local 3489, United Steelworkers of America*, 520 F.2d 516 (7th Cir. 1975), *aff'd sub nom., Local 3489 United Steelworkers of America v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977).

■ The district court relied on two facts to rebut the Secretary's *prima facie* case. It relied primarily on evidence that the Rank-and-File won the election in a landslide. The district court concluded that those who stood to gain the most from the absence of private voting booths were the incumbent Official Combined Caucus candidates and that their defeat showed that the violation did not affect the outcome of the election. The court suggested that secrecy is primarily for the benefit of the challenger, *see Bachowski v. Brennan*, 413 F.Supp. 147, 150 (W.D.Pa.), *appeal dismissed Bachowski v. Usery*, 545 F.2d 363 (3d Cir. 1976) and also reasoned that the polling site captains were Lopez loyalists who could have had an intimidating effect because voters might have feared they would share their observations with Lopez. We reject the court's suggestion that secrecy is only for the benefit of the challenger. While the court's assumption that the polling site captains would report to Lopez is reasonable, it is also the kind of "conjecture" which the Supreme Court criticized in *Hotel, Motel & Club Employees Union*. The defendant did not produce on the motion for summary judgment the "tangible evidence" necessary under *Hotel, Motel & Club Employees Union* to rebut the "reasonable possibility" of an effect on the election. It is conceivable that Rank-and-File members may also have exerted social pressure on their colleagues to vote for their slate and that in some way the outcome of the election was affected by the absence of guarantees for secret voting. *See* 391 U.S. at 508, 88 S.Ct. at 1752.

The district court also relied on the fact that on the day of the election a great number of union members were observed carrying in the voting areas green cards identifying Rank-and-File candidates. The court concluded that these members had determined in advance to support the Rank-and-File candidates which "raised doubt" that the violation of the LMRDA secret ballot rule may have affected the outcome of the election. The district court did not state and we find nothing in the record which suggests the number of union members who carried these cards into the polling places. Nor is there any evidence of the effect these cards had on the voting. It is possible that the actual effect of the cards was to exert pressure on the union membership to vote for the Rank-and-File slate. Even if the cards were sufficient to "raise doubt" as to the effect of the violation they are not sufficient to rebut the Secretary's *prima facie* case that the secret ballot violation "may have" affected the outcome of the election.

We decline the Secretary's invitation to fashion a *per se* rule that secrecy violations always "may have affected" the election. Defendant might be able, at a trial on the merits, to rebut the Secretary's *prima facie* showing. However, the uncontested facts the district court relied upon in ruling on

this motion for summary judgment were insufficient.

■ We assume, therefore, that the violation of the secret ballot requirement "may have affected" the outcome of the election. Nevertheless, we hold the district court properly granted summary judgment dismissing the action on the basis that "an implied exception to the dictates of § 482(c) exists in those rare cases such as the case at bar in which a union office-holder or incumbent union faction breaches the LMRDA election rules, loses an election, and then by complaining to the Department of Labor spurs the Secretary to commence a § 482(b) federal action to undo the election." District Court opinion at 376.

■ We agree with the Court of Appeals for the Second Circuit that a suit under § 482 of the LMRDA seeking an injunction to set aside a union election is essentially an equitable proceeding and is therefore governed by equitable principles. *Usery v. International Organization of Masters, Mates and Pilots*, 538 F.2d 946 (2d Cir. 1976). *See also Kupau v. Yamamoto*, 622 F.2d 449 (9th Cir. 1980). The Secretary's automatic invocation of the remedy Congress provided is contrary to the flexibility and practicality that characterizes equity jurisprudence, *See Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), and contrary to the spirit of the reforms and remedies Congress provided in the LMRDA.

The Secretary argues that the district court has no discretion to deny the § 482(c) remedy in this case because the language of the statute states that the district court "shall" order a new election in any case where the violation "may have affected" the outcome of the election.

The Secretary's argument is not only inconsistent with the spirit of the LMRDA but also with his interpretation of his own role under that statute. Section 482(b) states that the Secretary "shall" bring a civil action whenever he finds probable cause to believe that a violation of § 481 has occurred. However, as a matter of official "policy" the Secretary will not file suit to enforce the election provisions of the LMRDA where a violation has occurred unless the Secretary finds that the violation is such that the outcome may have been affected. 29 C.F.R. § 452.5. Also, although the statute states that the Secretary "shall" file suit within sixty days of receiving a complaint, the Secretary has interpreted the law so as to give himself discretion to extend by agreement with the union the time for filing suit. *See Hodgson v. Lodge 851 International Association of Machinists and Aerospace Workers*, 454 F.2d 545 (7th Cir. 1971). In *Local 851* this court agreed with the Secretary that he retained discretion to interpret his role in the LMRDA enforcement scheme in this practical and flexible way. We are in agreement with the district court and courts of appeals of other circuits that the trial judge also retains a limited amount of discretion in enforcing the election provisions of the LMRDA.

In *International Organization of Masters, supra*, the court, looking to the "practicality" of the situation and the flexibility of equity jurisdiction, held that the proper remedy in that case, in light of the intervening election, was to reorder the Secretary to supervise the next regularly scheduled election rather than to order an immediate election under the Secretary's supervision. Without adopting the Second Circuit's application of equitable principles in that case we endorse its recognition in § 482 proceedings that "the essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case." 538 F.2d at 950 quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944). *See, also, Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60–62, 95 S.Ct. 2069, 2076–2078, 45 L.Ed.2d 12 (1975).

The Ninth Circuit Court of Appeals has also refused recently to order a new election and dismissed the Secretary's suit as "improper" although the requirements of § 482 had been literally complied with. *Kupau v. Yamamoto, supra*. In *Kupau* the incumbent union faction refused to seat a newly elected union officer on the ground

that he was ineligible to run for office. In a suit brought by that officer under Title I of the LMRDA, the district court ordered the officer installed. The incumbent faction then instigated a suit under Title IV to have the results of the election declared void and a new election ordered. The Ninth Circuit held that use of the Title IV procedure by the Secretary was improper in that case. The court implied, as a requirement for a Title IV proceedings, that there be a genuine dispute between the Secretary and the union, and found that such a genuine dispute was absent in *Kupau.*

The legislative history of the LMRDA supports the practical and flexible position taken by these circuits and the district court here. Congress in enacting the LMRDA was attempting to remedy a wide variety of abuses uncovered in recent Congressional investigations regarding union elections and leadership. One of the three guiding principles the Senate followed in enacting Senate Bill 1555 which was passed by the House of Representatives and enacted in law as the LMRDA was that:

Remedies for the abuses should be direct. Where the law prescribes standards, sanctions for their violations should also be direct. The committee rejects the notion of applying destructive sanctions to a union, i. e., to a group of working men and women, for an offense for which the officers are responsible and over which the members have, at best, only indirect control. Still more important the legislation should provide an administrative or judicial remedy appropriate for each specific problem.

Senate Report No. 187, Apr. 14, 1959 [To accompany S. 1555], reprinted in 1959 U.S. Code Cong. and Admin. News at 2323. The remedies provided must be applied in the spirit in which they were created.

The legislative history does not reveal any indication that Congress considered the possibility that incumbent union factions would abuse the remedy provided in § 482(c) by intentionally violating the election rules in § 481 in an effort to invalidate an election they were about to lose. As the

Court noted in *Glass Bottle Blowers, supra,* the "reasonable inference" from the absence of any discussion is that this possibility did not occur to Congress. 389 U.S. at 468, 88 S.Ct. at 646.

■ Where, as here, a situation occurs which Congress did not contemplate in enacting the LMRDA, the statute is to be construed in light of the objectives Congress sought to achieve. *Id.* at 469, 88 S.Ct. at 647.

One objective Congress sought to achieve with the LMRDA was to "prevent, discourage, and make unprofitable" improper conduct by union officials. Senate Report No. 187, Apr. 14, 1959 [To accompany S. 1555], reprinted in 1959 U.S. Code Cong. and Admin. News at 2321. Through Title IV Congress sought to achieve "free and democratic" union elections. *Id.* at 2336. Congress was also interested in curbing abuse by "entrenched" union leadership, *Hotel, Motel & Club Employees Union, supra,* 391 U.S. at 499, 88 S.Ct. at 1748, and encouraging challenges to such leadership, *see Local 3489 United Steelworkers of America v. Usery,* 429 U.S. 305, 311, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977).

At the same time Congress sought to minimize governmental intervention into union affairs, Senate Report No. 187, *supra,* 1959 U.S. Code Cong. and Admin. News at 2323. Realizing that the remedy of a rerun election was inherently disruptive, Congress conditioned that remedy on exhaustion of union remedies and violations which "may have affected the outcome of the election." 29 U.S.C. § 482.

It takes little extrapolation to conclude that Congress, while seeking to discourage leadership abuse, encourage union democracy and challenges to entrenched leadership, and minimize governmental intervention, did not intend that the remedy provided in § 482(c) was to be used in the perverse way the Secretary would have us invoke it in this case.

■ The Secretary argues that equitable considerations are inappropriate because he, rather than a member of the incumbent

union faction, is the plaintiff. The Secretary cites *Hodgson v. Liquor Salesmen's Union, Local No. 2*, 334 F.Supp. 1366, 1381 (S.D.N.Y.1971) for the proposition that "[e]ven if the [complainant] had unclean hands that would not preclude the Secretary from pursuing the matter." This argument fails for two reasons.

First, assuming *Liquor Salesmen's* was properly decided it must be read in light of the fact that the Supreme Court has clearly held, albeit in a different context, that the behavior of the complainant can bar the Secretary from obtaining a new election. In *Hodgson v. Local Union 6799, United Steelworkers of America*, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971) the Court held that the protesting member's failure to raise a violation of which he was aware while he was pursuing his intraunion remedies barred the Secretary from challenging the election on the basis of that violation. In light of *Local Union 6799* the Secretary cannot maintain that the complainant's behavior is irrelevant simply because the Secretary is the actual plaintiff.

A second problem with the Secretary's argument is that it mischaracterizes the doctrine the district court applied in this case. The district court did not apply the "clean hands" doctrine which the court rejected in *Liquor Salesmen's, supra.* In *Liquor Salesmen's* the court refused to consider the union's argument that the complainant had been guilty of wrongdoing unconnected with the union election or the challenge to that election. The court's holding there is not inconsistent with the district court's refusal in this case to allow the incumbent union faction to simply use the Secretary as a tool in order to "torpedo" the election and gain a second chance at maintaining their entrenched position.

▮ The Secretary also contends that even if equitable considerations might in some cases preclude a rerun election the record here does not support this result.

The district court noted that it is a "rare" case which would not require the district court to order a new election where a violation which "may have affected" the election

occurred. We agree and add that it is an even rarer case where summary judgment is appropriate for determining that the statutory remedy should be withheld. However, we find that the uncontested facts in this case supported the court's use of its remedial discretion to withhold the requested remedy here.

It is undisputed that the Official Combined Caucus faction, under the leadership of Lopez and Connelly, was in charge of the 1976 election. Connelly and Lopez knew that federal law required that voting proceed in such a fashion that no voter could be identified as having voted in any particular way. Each was aware that the failure to provide private voting booths was one reason that the February, 1973 election for the Director of District 13 was overturned. The record also establishes that the Official Combined Caucus members knew that they were losing the election and planned to use the violations which occurred as a basis for challenging the election. The Secretary acknowledges that the burning of the unused ballots after the election was done for the purpose of providing a basis for challenging the election. Brief of Plaintiff-Appellant at 19.

The Secretary argues that the evidence did not establish that Hurley himself was involved in the preparations for the election or that he acted as a tool of Lopez and the Official Combined Caucus in protesting the election. Hurley was a member of the Combined Caucus for many years and in the 1976 election ran for re-election to the post of vice-chairman of the grievance committee on the Combined Caucus slate. The protest letters sent by Hurley and the Lopez group were "in large part absolutely identical."

There is evidence which suggests an actual agreement or conspiracy existed between Hurley and other members of the Combined Caucus and that Hurley was acting as a tool of the Combined Caucus. Hurley had nothing to gain for himself in protesting the 1976 election since the position of vice-chairman of the grievance committee is not an "officer" within the LMRDA's definition

and was not therefore included within the Secretary's complaint. Brief of Plaintiff-Appellant at 19. However, the district court did not rest its decision on the existence of such a conspiracy and we do not find an agreement between the complainant and the violators necessary to support the result reached here.

In this case Lopez through his immediate cronies invoked his intraunion remedies. Only after the union hearing where he and Hurley both spoke did Lopez stop pursuing the path to a new election. There was no need for Lopez to file a complaint with the Secretary once Hurley had done so. The incumbents who actually violated the LMRDA election rules can and, in this case may have, simply sat back and waited for some disappointed member of their faction to file a protest with the Secretary.

We do not hold that any time a member of a losing incumbent faction files a protest with the Secretary no new election should be ordered. We have rejected the defendant's suggestion that secrecy and safeguards are only for the benefit of the challenger. However where, as here, the incumbent faction was responsible for the intentional and blatant violations which occurred, and threatened to and has attempted to use these violations as a basis of unseating their challengers, the district court has the inherent equitable power to consider these facts and to mold the decree to fit the facts. Where, as here, granting the remedy the Secretary requests would have the perverse result of encouraging and rewarding deliberate violations of the LMRDA election rules the district court has the power to withhold that remedy.

Accordingly, the decision of the district court is

AFFIRMED.