Raymond **DONOVAN**, Secretary of Labor, Plaintiff-Appellant,

v.

**ILLINOIS EDUCATION ASSOCIATION,** Defendant-Appellee.

No. 81–1435.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1981.

Decided Jan. 4, 1982.

Rehearing and Rehearing En Banc Denied March 25, 1982.

to plead guilty based upon evidence adduced in determining his competence to stand trial. *Id.* at 1035.

John C. Hoyle, Civil Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Irving M. Friedman, Katz, Friedman, Schur & Eagle, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and SPRECHER and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The Illinois Education Association is a union of some 50,000 public-school teachers in Illinois. This case involves a challenge under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401 *et seq.*, to racial and ethnic restrictions in the Association's by-laws governing the election of officers.

The facts are not in dispute. The governance of the Association is vested in a Representative Assembly of about 600 members, elected by the union membership, and a Board of Directors originally of 50 members, some elected by the Representative Assembly and some by local affiliates of the union. In 1974, by majority vote of its members, the Association altered its by-laws in two respects. First, members of four minority groups—blacks, Asians, persons of Hispanic background (*e.g.*, Mexican or Puerto Rican), and American Indians—were guaranteed eight percent of the seats in the Representative Assembly. If they did not reach this level by the ordinary electoral process, the Board of Directors was directed to appoint enough additional members of the Assembly, drawn from the specified minority groups, to give the groups eight percent of the seats in the (enlarged) Assembly. Second, the Board of Directors was increased to 54 members and the four new places reserved for members of the specified minority groups. These reserved places were in addition to any that minority members might obtain in the normal way.

In 1977 the Secretary of Labor filed a complaint, initially unrelated to the by-law amendments set out above, against the Association. The complaint alleged that the Association was a labor organization within the meaning of the Labor-Management Reporting and Disclosure Act and that it had violated section 401(d) of the Act, 29 U.S.C. § 481(d), by appointing rather than electing its Secretary-Treasurer. An order was sought directing the Association to conduct an election under the supervision of the Secretary of Labor.

On the government's motion for partial summary judgment, the district court ruled

that the Secretary-Treasurer of the Association was an "officer" within the meaning of the Act, so that if the Association was a labor organization as defined in the Act he had to be elected rather than appointed. The parties later stipulated that the Association was a labor organization and therefore an election for Secretary-Treasurer should be ordered, but they disagreed over the ground rules for the election. The Secretary of Labor had received complaints about the minority-group by-laws, and sometime prior to April 22, 1980 (when the stipulation was filed) had concluded that they were contrary to the Act and should be enjoined before the election of a Secretary-Treasurer took place. The stipulation asked the court to decide the lawfulness of the challenged by-laws on the basis of briefs and affidavits submitted by the parties. After considering these submissions the court issued an order directing that the election be held pursuant to the Association's by-laws, including those that the Secretary of Labor had challenged. The Secretary appeals from that order.

■ We are met at the threshold with the argument that we lack jurisdiction to determine the lawfulness of the challenged by-laws because they were not challenged in the Secretary's original complaint. We reject the argument. Section 402(b) of the Act, 29 U.S.C. § 482(b), requires the Secretary, if he finds a violation—and the appointment rather than election of the Association's Secretary-Treasurer is conceded to be such—"to direct the conduct of an election ... under the supervision of the Secretary and in accordance with the provisions of [the Act]." The relevant provisions are in section 401. Since the Secretary-Treasurer is to be elected by the Representative Assembly, if the composition of the Assembly brought about by the challenged by-laws is itself unlawful the election would not be in accordance with the provisions of the Act unless the by-laws were changed. The question is somewhat less clear with regard to membership on the Board of Di-

rectors, since the Board will not be electing the Secretary-Treasurer. However, under Article IV of the Association's by-laws it is possible that the executive officers, who are now to include the Secretary-Treasurer, will be nominated by a Nominating Committee composed of members of the Board of Directors. So the Board does have a role in the election, and if the Board's composition is tainted by an unlawful by-law the election could be tainted as well. The Secretary of Labor had a duty to seek to enjoin by-laws that he thought would make the election unlawful under section 401. The court's order that the election be conducted in conformity with the existing by-laws is therefore the denial of an injunction and is appealable under 28 U.S.C. § 1292(a)(1).

■ Coming to the merits, we begin by observing that despite the racial character of the challenged by-laws, the case does not involve the legality of affirmative action. The Labor-Management Reporting and Disclosure Act was adopted long before affirmative action had been heard of, and the legislative history indicates that Congress did not want to legislate with respect to the racial practices, as such, of unions. *See, e.g.,* 105 Cong.Rec. 15826 (1959) (remarks of Rep. Landrum). Whatever may be the status of affirmative action under civil rights statutes or the equal protection clause of the Fourteenth Amendment, those laws are not involved in this litigation; nor is there any suggestion that the Illinois Education Association has ever engaged in racial or ethnic discrimination for which it is trying to make amends or head off complaints. We may assume that under the Labor-Management Reporting and Disclosure Act by-laws seeking to promote affirmative action are to be tested by the same standards as any other provisions affecting union elections.

Section 401(e) of the Act, 29 U.S.C. § 481(e), provides that in any election that the Act requires be held by secret ballot, "every member [of the union] in good standing shall be eligible to be a candidate

and to hold office (subject to ... reasonable qualifications uniformly imposed) and shall have the right to vote for ... the candidate or candidates of his choice ...." The members of the Illinois Education Association's Representative Assembly and the members of its Board of Directors are elected officers subject to this provision, *see* 29 U.S.C. § 481(d), and the challenged by-laws limit both eligibility for office and the right to vote for candidates of one's choice. No union member who is not a member of one of the four specified minority groups is eligible to run for any of the positions, either on the Board of Directors or in the Representative Assembly, that are reserved for members of those groups. Although there is no evidence in the record, and in oral argument the Association's counsel disclaimed knowing, how many white members the Association has, we may assume that they are the vast majority. The by-laws bar them as candidates, and restrict their choice in voting, for the positions set aside for members of the minority groups.

Our concern is not with the racial incidence of the restrictions but with their impact on freedom of candidacy and voting. It is true that section 401(e) of the LMRDA allows "reasonable qualifications" to be placed on candidacy, but this provision has been interpreted narrowly. "Congress plainly did not intend that the authorization in § 401(e) of 'reasonable qualifications uniformly imposed' should be given a broad reach." *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 499, 88 S.Ct. 1743, 1748, 20 L.Ed.2d 763 (1968); *Local 3489, United Steelworkers of America v. Usery*, 429 U.S. 305, 309, 97 S.Ct. 611, 614, 50 L.Ed.2d 502 (1977). We have found no recent decision upholding a candidacy qualification that excluded a majority of the union's membership, however reasonable the qualification may have seemed. Some pre-*Usery* decisions, notably *Brennan v. Local 5724, United Steelworkers of America*, 489 F.2d 884 (6th Cir. 1973), had upheld restrictions that disqualified more than half the union's members from run-

ning for specific offices; but the restriction upheld in *Brennan* was the very one later struck down in *Usery, see* 429 U.S. at 307, n.3, 97 S.Ct. at 613, n.3.

Moreover, the manner in which the bloc of reserved seats in the Representative Assembly is filled presents one of the specific dangers, that of self-perpetuating incumbency, which the election provisions of the LMRDA were designed to cure (*see, e.g., Wirtz, supra*, 391 U.S. at 499, 88 S.Ct. at 1748): the Board of Directors is empowered to appoint up to eight percent of the members of the Representative Assembly, which is a body that elects many of the Board's members. This is not a problem with the by-law governing the racial composition of the Board itself; the four seats reserved for members of the specified minority groups are filled by vote of the union's membership. But the threat to democratic values that this by-law poses is still great, for the reserved seats on the Board are in addition to any that the members of the minority groups might win in a free election. The Board at present has three such members, a number that when added to the reserved seats gives the members of the favored minority groups about 13 percent of the total seats on the Board; for all we know, this is substantially more than they could hope to win in a " 'free and democratic' union election ...." *Marshall v. Local 1010, United Steelworkers of America*, 664 F.2d 144, 150 (7th Cir. 1981).

However great the impact of the challenged by-law provisions on freedom of candidacy and scope of franchise, we need not and therefore do not assume that there is no set of facts that could possibly justify such restrictions. But the burden of justification has not been met in this case. Apart from two perfunctory affidavits which recite that the challenged restrictions "have begun to raise the consciousness of IEA members" and similar vague generalities, there is no evidence as to how the Association has benefited from the restrictions. The choice of the particular quotas that

were adopted is also unexplained. To begin with, the racial and ethnic composition of the Association is unknown. While there is evidence that 15 percent of the public-school teachers in Illinois belong to the specified minority groups, no one knows whether the Association—whose membership comprises only about half of those teachers—has the same composition. Nor does anyone know the breakdown of the Association's membership among the four favored minority groups. Because of the lack of information concerning the racial and ethnic make-up of the Association, we do not even know whether the minority groups in question really were underrepresented in the councils of the Association when the challenged by-laws were adopted in 1974.

Furthermore, while it may be plausible to regard black and Hispanic schoolchildren as having special problems for which teachers of the same racial or ethnic identity might have special solutions, it is not at all clear, at least in the absence of evidence, that any like presumption of reasonableness attaches to the decision to make Asians and American Indians favored minorities and to exclude other groups that might be equally plausible candidates for favor. Little more than one percent of Illinois public-school students are Asian, and one-tenth of one percent American Indian, and the corresponding percentages for public-school teachers are even lower. The by-laws do not even foreclose the bizarre possibility that the Board of Directors might fill up the bloc in the Representative Assembly reserved for members of the four minority groups with Asians who knew nothing about the problems of blacks, or with blacks who knew nothing about the problems of Asians, in order to construct a racial coalition that would keep the present Board members in office. We do not suggest that any such thing has occurred but it illustrates our grounds for doubting the reasonableness of the racial-ethnic qualifications that the by-laws impose.

Finally, the fact that those by-laws were approved by majority vote of a membership assumed to be overwhelmingly white is irrelevant. Plebiscitary democracy is not the theory of the electoral provisions of the LMRDA. If the white members of the Association are willing to vote generously in favor of minorities, they can be expected to elect minority-group members to offices in the Association in sufficient numbers to make unnecessary the electoral restrictions that on this record we are constrained to agree with the Secretary of Labor violate section 401(e) as a matter of law. *Shultz v. Local 1291, International Longshoremen's Ass'n*, 338 F.Supp. 1204 (E.D.Pa.), *aff'd per curiam sub nom. Hodgson v. Local 1291, International Longshoremen's Ass'n*, 461 F.2d 1262 (3d Cir. 1972), the only other decision we have found involving racial by-laws challenged under the LMRDA, is in accord with our decision, though distinguishable on its facts.

The judgment denying the injunction sought by the Secretary of Labor is reversed and the case is remanded for entry of a suitable injunction.

REVERSED AND REMANDED.