**Roy COMMER, Plaintiff,**

v.

**DISTRICT COUNCIL 37, LOCAL 375, Defendants.**

**No. 97 Civ. 8142(RWS).**

United States District Court,
S.D. New York.

Jan. 13, 1998.

Stuart Salles, New York City, for plaintiff.

Belson, Perlman & Szuflita, New York City Leonard A. Shrier, of counsel, for defendants.

*OPINION*

SWEET, District Judge.

Defendants Civil Service Technical Guild, Local 375, District Council 37, American Federation of State, County and Municipal Employees ("AFSCME"), AFL—CIO (the "Local Union") and District Council 37, AFSCME, AFL—CIO ("DC 37" and together with the Local Union, the "Defendants"), have moved to dismiss this action for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiff Roy Commer's ("Commer") complaint alleges two causes of action: (1) that the Defendants amended the Local Union's Constitution (the "Local Constitution") in violation of the AFSCME Constitution (the "Amendment Claim"); and (2) that Defendants violated section 411 of the Labor–Management Reporting and Disclosure Act of 1959 (the "LMRDA") by failing to certify his election as president (the "Election Claim"). For the reasons set forth below, Defendants motion to dismiss is granted.

### Prior Proceedings

Commer commenced this action *pro se* on November 10, 1997, and on that date filed an Order to Show Cause seeking a preliminary injunction to prevent the Local Union from amending its Constitution. Oral argument was held on November 19, 1997.

On November 12, 1997, Commer amended his Complaint to claim various election improprieties, and again filed an Order to Show Cause seeking a preliminary injunction to prevent the Local Union from proceeding with the officer elections (the "Election"). Oral argument was held on November 24, 1997.

On December 16, 1997, Commer filed a third Order to Show Cause, seeking a preliminary injunction to validate the results of the Election and to install him as President of the Local Union. By virtue of this Order to Show Cause, Commer also sought to amend his Complaint to allege the Election Claim, which, as more fully described below, contends that the ballots had been counted and tallied, and the results were announced by the Election Committee, but that the Board

of Delegates (the "Board") refused to certify his Election and install him as President.[1]

On December 23, 1997, Defendants filed the instant motion to dismiss. On or about this date, Commer found pro bono counsel to represent him in this action. Oral argument was held on December 31, 1997, at which time the motion was deemed submitted. The motion for preliminary injunction to validate the results of the Election was adjourned pending the disposition of the jurisdictional motion.

### Facts

When considering Defendants' motion to dismiss for lack of subject matter jurisdiction, all material factual allegations in Commer's Complaint must be accepted as true. See Scheuer. v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992); Rubin v. Tourneau, Inc., 797 F.Supp. 247, 248 (S.D.N.Y.1992). The court must examine the substance of the allegations and any other evidence before it in resolving the jurisdictional dispute. Cargill Intern, S.A. v. M/T PAVEL DYBENKO, 991 F.2d 1012, 1019 (2d Cir.1993); Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986); RAD Data Communications, Inc. v. Patton Electronics Co., 882 F.Supp. 351, 352 (S.D.N.Y.) (citations omitted), dismissed on other grounds, 64 F.3d 675 (Fed.Cir.1995). However, the Court will not draw inferences favorable to the party asserting jurisdiction. See Norton v. Larney, 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925); Atlantic Mutual, 968 F.2d at 198.

### A. The Amendment Claim

Commer contends that the procedures followed to propose certain amendments to the Local Union membership (the "Membership") did not comply with the procedures set forth in Article XX of the Local Constitution which, in sum, require: (1) submission in writing by a delegate at any meeting of the Board; (2) referral to a special committee for study and report; (3) approval by majority vote of delegates voting at a meeting of the Board; (4) transmittal by mail to each member in good standing a copy of the proposed amendment, together with a ballot; (5) allowance of fifteen days for members to return their ballots; (6) appointment by the Local Union president, at the next meeting of the Board, of at least three tellers to count the ballots; and (7) announcement of results before the end of meeting. Commer contends that the procedures actually followed unfairly prevent the Members' input into the amendment process.

Defendants, on the other hand, contend that the Local Union fully complied with all constitutional procedures. The amendment at issue here ("Proposed Amendment 6") would eliminate section 6 of Article XIV of the Local Constitution, which provided that: "Nothing in the Constitution shall be construed to prevent direct action by a chapter when members of that chapter alone are affected; however, such departmental matters may be handled by the Board of Delegates." Eliminating the right for a chapter to take "direct action," Commer contends, limits his authority as chapter president to serve his constituency.

Defendants contend that this amendment was initially proposed by Richard Delio ("Delio") at a delegates' meeting held May 21, 1997. The Constitution Committee, after meetings with interested Members, recommended to the Local Union's Executive Committee on October 7, 1997, that six proposed constitutional changes be adopted. Commer, as a chapter president, is a member of the Executive Committee and attended the October 7 meeting. The Constitution Committee then, on October 15, 1997, reported their recommendation to the Board, and, at the same meeting, the Board adopted the recommendation. The next day, October 16, 1997, the Constitution Committee caused ballots to

---

1. As clarified by counsel obtained by Commer after he filed the third pro se Order to Show Cause, Commer intended to further amend his Complaint to strike the claim of election improprieties and withdraw his motion for an injunction preventing the completion of the election, and rather to substitute for this claim the allegations contained in the Election Claim. The Court hereby grants Commer leave to amend his complaint to conform it to the present allegations.

be sent to the Membership along with a copy and brief explanation of the proposed amendments. The ballots were made returnable on November 5, 1997.[2] Proposed amendment 6 was explained as follows:

The Constitution Committee recommended this change since this provision is in clear conflict with Article IX Section 45 of the International Constitution which states "No member or group of members or other person or persons shall have the power to act on behalf of or otherwise bind the local union ... except to the extent authorized in writing by the president of the local union ... or by the executive board of the local union."

The Executive Committee decided to count the amendment ballots on Monday, November 24, 1997, since on that same date the Local Union planned to count election ballots.

Defendants contend that Commer filed a Complaint with the International Union's Judicial Panel (the "Judicial Panel") on October 18, 1997, seeking that they exercise original jurisdiction over the matter. On November 25, 1997, the Judicial Panel granted Commer's request and so notified Commer and Mr. Louis Albano ("Albano"), the incumbent Local Union President.

### B. *The Election Claim*

The Election Claim involves an election of officers, chairs of standing committees and delegates to the District Council 37 and Central Labor Council that was initiated in November 1997. In that election, Commer was a candidate for the office of president.

The Election ballots were mailed on November 5, and were made returnable by November 21, 1997. On November 24, 1997, the Election Committee, assisted by approximately 40 ballot counters and observed by representatives of the various candidates, held an election counting meeting.

Sometime before 5:00 AM the following morning, and according to the Defendants before the Officer and Chair ballot counting

was completed, the Election Committee decided that the ballot counting for positions other than the officers and Chairs would need to be put-off to a later date. The ballot counting for the Officers and Chairs of the Standing Committees was then completed. The tally sheets were collected from the individual counters. Two members of the Election Committee transferred the results from the individual tally sheets to a grand tally sheet and totaled the results using an adding machine.

Commer contends that at that point he was notified that he had won election to the office of president, and that his observer's tally sheet showed that the victory was by approximately 80 votes out of a total of about 2,000 votes counted—a margin of victory of about 4%. Defendants contend that the results were preliminary.

Defendants contend that all the candidates present then agreed that, due to the late hour, the count could be stopped and the Election materials stored in the DC 37 security office until the count could be completed. In the presence of observers for the candidates, the Election materials were packed in boxes, taped, and signed across the tape by a member of the Election Committee. The taped boxes were taken to the DC 37 security office and placed in a locked room. Defendants claim that no member of the Election Committee nor any candidate had access to that room.

On December 8, 1997, two weeks after the ballot counting was suspended, members of the Election Committee, accompanied by observers for Albano and Commer and an attorney for DC 37, went to the security office to retrieve the boxes to complete the delegate ballot counting. When the boxes were opened and the contents reviewed, the following items were found to be missing: (1) approximately 1,200 counted ballots for delegate positions; (2) all of the individual tally sheets for the delegate ballots; (3) all of the individual tally sheets for the Officer and Chair ballots; and (4) the grand tally sheet

---

**2.** The ballots were printed, by agreement of the Executive Committee, on October 9, 1997, which was prior to the Constitution Committee's report

to the Board. Defendants contend, however, that no ballots were mailed prior to Board approval.

for the Officer and Chair ballots along with the adding machine tapes.

On Monday, December 15, 1997, the Election Committee met and decided to recommend to the Board not to install any candidates and to rerun the Election as soon as possible by an independent outside body. They further decided to recommend that the incumbent Officers, Chairs and Delegates remain in place until the rerun could take place.

On Wednesday, December 17, 1997, the Election Committee reported its conclusions to a combined meeting of the Board and the general membership, and the Board adopted the recommendations.

Accordingly, Albano has retained his position as President of the Local Union. On December 23, 1997, Albano wrote a letter to the United States Department of Labor (the "DOL") requesting an investigation to clarify the events surrounding the disappearance of the Election materials.

Commer contends that the Election was conducted under the control and direction of Albano and his faction of incumbent officers. Commer contends that the Election Committee, appointed by Albano, recommended to invalidate the Election on the pretext that someone filed a protest to the Election, and that the protest could not be properly investigated without recourse to a complete record of the Election. Commer contends that, at a minimum, Albano is chargeable with the responsibility for the mishandling of the Election materials, and that possibly he engineered the disappearance.

### Discussion

#### I. Standard for Motion to Dismiss

■ The party invoking federal jurisdiction must "allege in [its] pleading the facts essential to show jurisdiction," and "must support (those facts) by competent proof." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *see also Board of Educ. of the Mount Sinai Union Free Sch. Dist. v. New York*

*State Teachers Retirement Sys.*, 60 F.3d 106, 109 (2d Cir.1995) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). Therefore, Commer bears the burden of satisfying the jurisdictional requirements of the LMRDA.

#### II. The Title I Claim and Requested Relief

Commer seeks to enjoin the Local Union to certify his Election and to install him as president, thereby reversing the Board's vote to invalidate the Election and schedule a rerun by an independent election organization as soon as possible. Commer contends that the Election Committee completed the tallies of the officer ballots and announced that he had more votes than Albano, and thereby won the Election. This result, Commer alleges, is confirmed by tally sheets made contemporaneously with the Election Committee's announcement by observers. He further contends that, in these circumstances, the incumbent Albano should not profit from the mishandling, whether intentional or not, of the Election materials which occurred under his direct control. He insists that the circumstances require his installation as president, thereby permitting Albano to seek Title IV post-election relief, if applicable.

The relief sought by Commer has support in logic and equity. Judith Disla ("Disla"), the Chair of the Election committee appointed by Albano and who serves at his pleasure,[3] provides no reasons in her affidavit for recommending to the Board not to install Commer. Her conclusory statement that "there was no way to recommend any candidates for installation based on the remains of the results of the election" is insufficient. Disla provides no explanation why, despite agreeing to complete the election count expeditiously, the continuation was not scheduled until two weeks later. Furthermore, Disla provides no details regarding the Election material security provisions (e.g., whether all of the sealed boxes were initially received at the Local Union's security office, who trans-

---

**3.** "The President of the Guild shall appoint the members of [other] committees and name the chairs.... They shall serve ... at the pleasure of the President." Local Constitution, art. XVI, § 2.

ported the boxes, whether the same number of boxes existed when the count was scheduled to continue, and who had access to the security office during the two week interval).

Most troubling, Disla does not mention in her sworn affidavit even the existence of any protest to Commer's declared election as President, whereas in her report which the Board relied on in deciding to rerun the entire Election she states that "The Committee was informed that one protest had been filed and agreed that it would be inappropriate to consider the protest before we had a completed election." Disla does not explain why, if a protest did exist, the Election Committee did not decide to install Commer and consider the protest thereafter, as is permitted by the International Constitution. *See* International Constitution, § 4(B).[4] Nor does she explain why the Election Committee decided not to conduct a protest hearing for "[a]ll interested parties," as required by the International Constitution, to determine the merits of the protest before using it as a justification for its recommendation to discard the results. One of the strongest arguments for requiring a rerun would be the existence of a meritorious protest to Commer's election which could only be resolved by review of the Election materials. Disla's failure to even mention a protest in her affidavit, and the failure of the Election Committee to act upon the protest lends credibility to Commer's contention that the existence of a protest was a mere pretext to justify the Election Committee's recommendation to the Board.[5]

### III. *The LMRDA Title I Relief Sought Is Preempted By Title IV*

Defendants contend that Title IV of the LMRDA preempts this Court's jurisdiction under Title I of the LMRDA to grant the relief requested. *See* 29 U.S.C. §§ 481–483 (Title IV); 29 U.S.C. §§ 411–413 (Title I). Title I provides a "Bill of Rights" whereby each union member shall have "equal rights" to, *inter alia,* vote in elections and to "participate in the deliberations and voting upon the business" of membership meetings.[6] *See* 29 U.S.C. § 411(a)(1). Title IV, on the other hand, governs union elections. It fixes the terms during which they hold office, requires that elections be by secret ballot, regulates the handling of campaign literature, requires a reasonable opportunity for the nomination of candidates, authorizes unions to fix "reasonable qualifications uniformly imposed" for candidates, and overall attempts "to guarantee fair union elections in which all the members are allowed to participate." *See Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); 29 U.S.C. § 482.

The enforcement mechanisms provided by Title I and Title IV differ. Title I provides for a private right of action for "appropriate" relief, including injunctions, in a district court to any union member whose rights granted under Title I have been violated. *See* 29 U.S.C. § 412. On the other hand, Title IV provides only a right of action in a

---

4. The International Constitution provides that:

   Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or by filing such protest in writing with the subordinate body within ten days following the election. All interested parties shall be afforded an opportunity to be heard. Such protests shall be decided by the subordinate body not later than thirty days after the filing of the protest.

   International Constitution, § 4(B). It further provides that:

   If the subordinate body determines that there were violations which may have affected the outcome of the election, it may order such election or any part thereof set aside, and a new election held. Any officers who have been installed prior to such determination shall remain in office pending the outcome of any new election or of a future appeal.

International Constitution, § 4(C).

5. Also left unexplained is why the ballot counting for approval of the proposed amendments, which was scheduled for the same day as the Election ballot counting and all of which passed, was not also invalidated.

6. 29 U.S.C. § 411(a)(1) provides that:

   Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

**318**

district court to the Secretary of the Department of Labor (the "Secretary"). *See* 29 U.S.C. § 482. The comprehensive administrative and judicial procedures provided by section 482 are initiated by any labor organization member who alleges a violation of Title IV. *See* 29 U.S.C. § 482(a). Only after the member first exhausts any internal remedies available under the constitution and by-laws of his union may he file a complaint with the Secretary. *See id.* Finally, if after an investigation the Secretary finds probable cause to believe a violation has occurred, "he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization" in federal district court, to set aside the election if it has already been held, and to direct and supervise a new election. *See* 29 U.S.C. § 482(b). A district court may invalidate an election already held, and order the Secretary to supervise a new election, if the violation of Title IV "may have affected the outcome" of the previous election. 29 U.S.C. § 482(c).

■ Title I and Title IV rights may overlap, *see Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley,* 467 U.S. 526, 539, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (Title IV protects many of the same rights as does Title I), and when they do, the exclusivity provision in Title IV must be considered. Post-election relief is barred as a matter of subject matter jurisdiction, since "[t]he remedy provided by [Title IV] for challenging an *election already conducted* shall be exclusive." 29 U.S.C. § 483 (emphasis added).[7] On the other hand, Title IV is not exclusive for claims "with respect to elections *prior to the conduct thereof*". *Id.* (emphasis added) ("Existing rights and remedies to en-

force the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of [Title IV].").

When a Title I action is sought during the course of an election, the exclusivity issue is more vexing. The Supreme Court, in *Crowley,* held that in such circumstances a court's jurisdiction depends on the appropriateness of the remedy sought in light of the intent of Congress in enacting a different regulatory regime in Title IV. *See id.,* 467 U.S. at 542 (court must consider the " 'legislative history in light of the general objectives Congress sought to achieve' "). The Court, interpreting Title I's self-limitation to granting only "appropriate" relief, 29 U.S.C. § 412, held that:

> whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the remedy required to eliminate the claimed statutory violation. If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV.

*Id.* at 550. The Court's rationale was that Congress recognized the "undesirable consequences that follow from judicial supervision of a union election." *Id.* As the Supreme Court noted, "throughout the congressional discussions preceding enactment of both Title I and Title IV, Congress clearly indicated its intent to consolidate challenges to union elections with the Secretary of Labor, and to have the Secretary supervise any new elections necessitated by violations of the Act." *Id.* at 543.[8] On the other hand, "members

---

7. Commer cites *Kupau v. Yamamoto,* 622 F.2d 449 (9th Cir.1980) in support of the proposition that this Court has authority under Title I to enjoin the Board to certify and install him as President. In *Kupau,* it was not disputed that the plaintiff won a narrow victory over the incumbent. After this result was known, however, the union executive board, the majority of whom were part of the incumbent's election slate, decided that Kupau was ineligible to run for union office and refused to install him. *Id.* at 452. The district court, after a preliminary injunction hearing, concluded that he was likely to prevail on the merits and issued a preliminary injunction

ordering his installation. *Id.* at 453. The Ninth Circuit affirmed, holding that Title IV did not preempt Kupau's Title I claim. *Id.* at 455–56.

*Crowley,* however, overruled *Kupau* to the extent that, if pursuant to the union's rules the relief sought was post-election, then the Title I claim would have to be dismissed.

8. In *Crowley,* the District Court enjoined ballot counting on the day before all ballots were to be returned. *Id.,* 467 U.S. at 530. The court "declared the ballots cast ... to be 'legally without effect' and provided detailed procedures to be followed by the union during a new nominations

may properly allege violations of Title I that are easily remediable under that Title without substantially delaying or invalidating an ongoing election." *Id.* at 546.

▮▮ Therefore, where a defendant claims that a court lacks subject matter jurisdiction to consider a Title I claim due to the exclusivity provisions of Title IV, step one is to determine whether the claims in fact overlap; that is, whether the asserted claim is also cognizable under Title IV. If the claim is cognizable, then step two is to characterize the claim as preelection, post-election or during an election. If the relief sought is preelection, then it may be maintained if the Title I exhaustion requirement is met. If post-election relief is sought, the claim must be dismissed. If relief is sought during an election, then the court must proceed to step three to establish whether it is appropriate in light of Congressional intent. If the relief sought is appropriate, then the court proceeds to the final step 4, which is to determine whether Title I's exhaustion requirement has been satisfied.

### A. *Commer's Claim Is Cognizable Under Title IV*

▮▮ Commer contends that his claim is not cognizable under Title IV, and therefore he can not be precluded from bringing this action under Title I. Commer bases this contention on his claim that he does not seek relief as an unsuccessful candidate in a "disputed election," but rather seeks to have his Election certified and to be installed as President. Commer contends that once he is installed, the losing candidates may, if they desire, seek post-election review pursuant to Title IV.

The rights provided under Title IV, however, are not limited to invalidating completed elections. For example, 29 U.S.C. § 481(a)

provides that "Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing." Presumably, this right would be enforceable pursuant to section 482, which permits a member to file a complaint "alleging the violation of any provision of section 481." Therefore, the Secretary has the authority to "direct the conduct of an election" even where an election has not yet occurred.[9]

Moreover, Commer's Title I claim overlaps with rights provided under Title IV. For example, section 481(c) provides that "[a]dequate safeguards to insure a fair election shall be provided" and section 481(d) provides that the "election officials designated in the constitution ... shall preserve for one year the ballots and other records pertaining to the election." Section 481(d) further provides that the "election shall be conducted in accordance with the constitution and bylaws of such organization."

To the extent that Commer's claim is that the Local Union has no grounds to refuse to certify his election, and that any grounds which may exist are the result of intentional misdeeds by the incumbent President and his faction, Commer's claims are cognizable under these provisions of Title IV.

### B. *The Claim Arises After The Conduct Of An Election And Must Be Dismissed*

With respect to the temporal position of this claim, Commer contends that the Election is complete, and the Defendants are inconsistent on this point. While Defendants contend that Commer's claim is preempted by Title IV since it arises after the Election has been conducted, they also contend that the Election count was "preliminary."

meeting and a subsequent election" including selecting "an outside group of arbitrators to conduct and supervise the election, [setting] forth eligibility requirements for attending the nominations meeting, being a candidate for office and voting." *Id.* at 533. On these facts, the Supreme Court held it is inappropriate relief under Title I to grant an injunction supervising a union election for a claim arising during the course of an election. *Id.* at 545.

9. The language of section 482(b) supports this conclusion, since it states that the Secretary may seek "to set aside the invalid election, if any." The "if any" implies that an invalid election need not be a prerequisite to enforcement action under Title IV.

### 1. *Commer Has Been Declared Elected President*

The AFSCME Constitution (the "International Constitution") provides: "Upon completion of the voting, the ballots shall be tabulated and the candidate for each office receiving a majority of the votes cast for that office shall be declared elected.... Those elected shall be installed in office immediately upon the subordinate body's acceptance of the Election Committee's general report in the election." [10] International Constitution, App. D(J). There is no provision for "preliminary" results. Rather, once ballots are tabulated, the winner of a majority of the votes "shall be declared elected." There is no dispute that the Officer ballots were tabulated, or that Commer received a majority of the votes according to that tabulation. Accordingly, Commer has been elected President.

### 2. *The Election Committee Report and Installation Is Post–Election*

■ The use of the past tense—"[t]hose elected"—demonstrates that the report and installation takes place postelection. A candidate must be elected, therefore, before the Election Committee prepares its report. Moreover, the protest procedure provides that protests may be filed as of the meeting at which the election is conducted, and for ten days thereafter. *See* International Constitution, § 4(B). These protests may, as here, be considered by the Election Committee in writing its report to the Board. *Cf.* International Constitution, App. D, § 2(B) ("The Election Committee shall also report, as expeditiously as possible, the results of the balloting, together with recommendations regarding any protests which have been lodged regarding the conduct of the election.").

10. A Local Union is a "subordinate body" to the International Union, and section 2 governs the election of subordinate body officers.

   The Election Committee has "general responsibility of the conduct of the election in accordance with this Constitution and the constitution of the subordinate body." International Constitution, § 2(B).

11. *Crowley did not decide the precise meaning* of "already conducted" language, but rather assumed that it meant "actual tabulation and certification of ballots have been completed." *Crowley*, 467 U.S. at 541.

Therefore, the "election is conducted" at the meeting where the ballots are counted. [11]

The Election Committee report and the Board decision regarding installation of officers must comply with the rights granted by Title IV of the LMRDA. These rights, however, will be enforced by the Secretary and backed up, when necessary, by the expert election supervision available from the DOL. *See Crowley*, 467 U.S. at 544 & n. 19 (DOL has superior capability to supervise a new election); *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) ("Title' IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections.").

Commer contends that if he could prove misconduct by Albano, then the Court should discard his protest and declare him the elected president. Commer cites *Marshall v. Local 1010*, 664 F.2d 144 (7th Cir.1981) to support the proposition that equitable principles, including unclean hands, would apply in fashioning an appropriate remedy under Title I. In *Marshall*, the Secretary brought a complaint to invalidate a union election. The district court, however, dismissed the complaint on the grounds that the investigation was initiated by an incumbent union president with unclean hands, and the Seventh Circuit affirmed. The court held that, although the alleged improprieties may have affected the outcome of the election, the court was correct to apply equitable principles to deny the applicability of Title IV's rights where the incumbent lost the election, and then sought to exploit the improprieties he intentionally caused during the election to gain a rerun. *Id.* at 150. [12]

12. The court stated that:

   It takes little extrapolation to conclude that congress, while seeking to discourage leadership abuse, encourage union democracy and challenges to entrenched leadership, and minimize governmental intervention, did not intend that the remedy provided in section 482(c) was to be used in the perverse way the Secretary would have us invoke it in this case.
   *Id.* at 150.

*Marshall,* however, was a Title IV case and therefore is not directly applicable to the Title I claim here. If Commer files a complaint with the DOL, the unclean hands argument may be relevant in deciding whether Commer should be installed as President, and whether a rerun should be ordered. If the Secretary, upon investigation, concludes that Albano was responsible for election improprieties, then he may apply the unclean hands doctrine to deny him the benefit of a rerun, or may seek other appropriate remedies. The Secretary may also seek to install Commer during the pendency of any DOL action since section 482(a) provides that the "challenged election shall be presumed valid pending a final decision thereon." 29 U.S.C. § 482(a).[13]

Because the Election has taken place, any action to invalidate the recommendation of the Election Committee adopted by the Board, even if based upon fraudulent conduct, falls under Title IV rather than Title I under the rationale of *Crowley.* To conclude otherwise would displace the Local Union process permitting protest, Election Committee recommendation and Board installation—a step that only the DOL can request the Court to take.

## IV. *The Amendment Claim Is Dismissed*

Defendants contend that the Amendment Claim must be dismissed for lack of subject matter jurisdiction because Commer must first seek relief from the Judicial Panel before resorting to the Court. The statutory requirement for exhaustion is different for Title I and Title IV. Whereas Title IV mandates exhaustion when "remedies [are] available under the constitution and bylaws of such organization", as long as a decision is rendered within three months,[14] Title I mandates exhaustion only when it is *required* by the Union's rules.[15]

The International Constitution states that "Except as hereafter provided in this Article, any member of the Federation may file charges against any individual for actions taken while a member of the Federation or while a staff employee of the Federation or a

---

**13.** Commer also claims jurisdiction pursuant to the Labor–Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a), which provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Commer's reliance on *Wooddell v. International Bhd. of Elec. Workers, Local 71,* 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991), however, is misplaced. The Supreme Court in *Wooddell* held that the subject-matter jurisdiction conferred on the district courts by this section of the LMRA extends to suits on union constitutions brought by individual union members. *Id.* at 98. The suits at issue, however, were grounded on contractual obligations among unions found within the union constitution. *Wooddell* does not apply, as here, to claims where the purported contractual agreement is between the individual member and the union.

**14.** 29 U.S.C. § 482 provides that:

A member of a labor organization—(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation, may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

**15.** 28 U.S.C. § 412(a)(4) provides that:

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That *any such member may be required to exhaust* reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof.... (Emphasis added.)

**322**

subordinate body." *See* International Constitution, art. X, § 1 (emphasis added). By its plain language, the use of "may" rather than "shall" makes resort to the Judicial Panel's remedies permissive, but not mandatory.

Defendants contend that exhaustion is mandatory because the International Constitution also states that a basis for filing charges to the Judicial Panel includes "[i]nstituting or urging others to institute action outside the union against the Federation, a subordinate body, or any officer of the Federation or of a subordinate body without first exhausting all internal remedies within the Federation." *See* International Constitution, § 2(H). This provision, however, permits a union member to seek sanctions against another member, it does not by its terms require members to exhaust the union's remedies. There may, for example, be valid defenses for not bringing a claim first to the Judicial Panel. Furthermore, if the Union wanted to require exhaustion, it should do so in a more direct way.

However, Defendants contend that Commer has elected to bring the Amendment Claim to the Judicial Panel, and therefore the Court should dismiss the claim for lack of subject matter jurisdiction. Commer contends that the scope of his complaint to the Judicial Panel does not include the Amendment Claim, and therefore he has not elected to pursue relief from the Judicial Panel.

In his letter sent to the Judicial Panel dated October 18, 1997, Commer states his complaint as follows: "Amendments (sic) to the Local's constitution are being forced upon the members without compliance with the procedures clearly required [by Article XX of] the [local] constitution." This claim is indistinguishable from that made in the Complaint. Accordingly, having elected to pursue the remedy provided by the International Constitution, the Court must dismiss the Amendment Claim on the grounds that Commer has deprived this Court of subject mat-

ter jurisdiction until the Judicial Panel remedy is exhausted.[16]

### Conclusion

For the reasons set forth below, Defendants' motion to dismiss this action is granted.

Submit judgment on notice.

It is so ordered.

---

**16.** We note that Title I requires the Judicial Panel to render its final decision within four months of the filing date of the complaint, after which period exhaustion is no longer required. *See* 29 U.S.C. § 411(a)(4). Therefore, since Commer filed his complaint on October 18, if no relief is provided by February 18, Commer may file resort to Title I remedies, if any.