761 F.2d 870
 119 L.R.R.M. (BNA) 2249, 102 Lab.Cas. P 11,459
 Raymond J. DONOVAN, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellant, Cross-Appellee,
Helen Carter, Plaintiff-Intervenor,
v.
CSEA LOCAL UNION 1000, AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO,
Defendant-Appellee, Cross-Appellant.
Helen Carter, Intervenor.
 Nos. 714, 715, Dockets 84-6292, 84-6308.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1985.
Decided May 1, 1985.
 
 Valerie J. Daye, Washington, D.C. (Francis X. Lilly, John F. Depenbrock, Helene Boetticher, U.S. Dept. of Labor, Washington, D.C., of counsel), for plaintiff-appellant-cross-appellee.
 Daniel E. Clifton, New York City (Clifton & Schwartz, New York City, of counsel), for intervenor.
 Michael J. Smith, Albany, N.Y. (Roemer and Featherstonhaugh, P.C., Albany, N.Y., of counsel), for defendant-appellee-cross-appellant.
 Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This action, instituted by the Secretary of Labor under the Landrum-Griffin Act of 1959, challenges the 1982 election of statewide officers of the Civil Service Employees Association (CSEA or Union) in New York based upon a complaint made by a union member. At the heart of the Landrum-Griffin Act is the premise that unions should conduct their internal affairs through democratic processes. Some believe that like Don Quixote, Congress was attempting the near impossible task of repealing the "iron law of oligarchy" inherent in large-scale one-party organizations. Thus, it falls upon courts construing the Act to effectuate its premise in the face of the strong tendency toward obligarchic control that is an inevitable result of a single-party structure. Contrary to the court below, we conclude that the nominating procedure at issue violates the Act because it gives an unfair advantage to incumbents and other members of the union hierarchy. Accordingly, we reverse.
 
 
 2
 As a result of Helen Carter's complaint, the instant action was brought by the Secretary of Labor under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. Secs. 481-483 (1982) (LMRDA or Act). The Secretary sought an order from the United States District Court for the Northern District of New York (Miner, J.) declaring that the CSEA had violated Sec. 401(b) of the Act by failing to conduct an election for its statewide offices by secret ballot. 29 U.S.C. Sec. 481(b). He also sought an order declaring that the CSEA had violated Sec. 401(e) of the Act by: (1) imposing unreasonable candidacy requirements; (2) imposing candidacy requirements in a non-uniform manner; (3) denying members in good standing a reasonable opportunity to nominate candidates; and (4) denying members in good standing the right to be a candidate. 29 U.S.C. Sec. 481(e). The Secretary sought a new election conducted under his supervision. The CSEA denied these allegations and asserted as an affirmative defense that the district court lacked jurisdiction because Carter had failed to exhaust her internal union administrative remedies as required by Sec. 402(a). 29 U.S.C. Sec. 482(a).
 
 I. CSEA's 1982 Election
 A. Nominating Procedures
 
 3
 Representing employees of the State of New York and its various political subdivisions, the CSEA has almost 200,000 members. The Union is divided into 6 regions, 313 locals, and 933 units. Most of its locals have fewer than 500 members. Nominations for election to its statewide offices of President, Executive Vice-President, Secretary and Treasurer are governed by article IV, section 5(b) of its Constitution and Bylaws, which provides for a statewide nominating committee made up of three members from each of the six regions. Members of the committee are selected by the executive board of each CSEA region, and not by the rank and file. The committee is required to select at least two candidates for each statewide office from among those members in good standing who have timely submitted a "Request to Be a Candidate" form. A potential candidate must receive a plurality vote of the committee to be placed on the ballot. In 1982 the constitution provided that incumbent officers who wanted to be candidates were automatically placed on the ballot.
 
 
 4
 Neither the constitution nor any other document provides guidelines for committee members to use in selecting candidates. The record indicates that committee members have based their decisions to vote for or against particular candidates on such attributes as education, expertise, experience, and involvement in CSEA activities. The committee members have derived this information from the submitted forms and their personal knowledge of the candidates. A CSEA member seeking statewide office who is rejected by the committee may still have his or her name placed on the ballot if the member is able to obtain the signatures of two percent of the membership on a petition within six weeks of being turned down by the committee. The signature requirement was 3,800 based on 1982 membership.
 
 
 5
 All four incumbents chose to be placed on the ballot for the 1982 election. Seven members applied to be candidates. The committee nominated four and rejected three, including Carter who was seeking to be Secretary. In total, the Committee nominated three individuals for President, two for Executive Vice-President, two for Treasurer, and only one, the incumbent, for Secretary. Of the four incumbents all but the Treasurer were reelected. Only one of the three members who were rejected successfully obtained the signatures needed to win a spot on the ballot. The record does not reveal whether either of the other two attempted to obtain signatures.
 
 B. Helen Carter's Protests
 
 6
 The only provision in the CSEA Constitution and Bylaws concerning election protests is in article III, section 2 and states that a member must file a protest with the Executive Director of the CSEA by certified mail within ten days of the official announcement of the election results. Prior to the election Helen Carter had protested to the CSEA Board of Directors and to the statewide election procedures committee regarding the nominating committee's selection of candidates. She was informed that her protest was untimely--because the Union's constitution did not provide for pre-election protests--and that a response by the CSEA to her protest would be inappropriate because she had instituted a federal action. (That action has been indefinitely stayed by the Eastern District.)
 
 
 7
 The CSEA's mail ballot election was conducted on June 15, 1982 and the results of the election were telegrammed to the candidates that same day. The official results were published in the June 18th edition of the CSEA newspaper. Carter sent a letter making numerous protests about the election to the Executive Director. On June 25, the last day of the ten-day period, she sent a telegram--orally communicated to the Union that same day--in which she amended her protest to allege that the nominating procedure was "arbitrary and discriminatory" in violation of the LMRDA. The Union received a written confirmation of the amended election protest on June 28, the next business day. The statewide election procedures committee informed Carter that her protests were untimely because they had not been made within ten days of the date the events she complained about occurred. As a result, Carter complained to the Secretary, who instituted the present action in the district court.
 
 II. District Court Ruling and Rerun Election
 
 8
 The district court 594 F.Supp. 188, held that the CSEA had violated Sec. 401(b) of the Act by failing to conduct its election by secret ballot, and ordered the CSEA to hold a new election within 90 days. 29 U.S.C. Sec. 481(b). It further held that the nominating procedures did not violate Sec. 401(e) of the LMRDA. 29 U.S.C. Sec. 481(e). Noting that the CSEA apparently did not know until just prior to the 1982 election that its elections were subject to the Act, the district court then held that the use of the nominating committee, standing alone, violated the Act. But the district judge went on to hold that the alternative procedure, which allowed members rejected by the committee to obtain a place on the ballot by submitting a petition signed by 3,800 members, provided a reasonable alternative to the concededly unreasonable committee method of nominating. The Secretary's motion for summary judgment regarding the nominating procedures was therefore denied. The CSEA's motion for partial summary judgment was also denied upon the court's finding that Carter had exhausted her internal union remedies before submitting her complaint to the Secretary.
 
 
 9
 Pursuant to the district court's order, the CSEA held a rerun election. The election was supervised by the Secretary, and members voted by secret ballot. Prior to the district court's decision, the CSEA had agreed to discontinue its practice of automatically placing incumbents' names on the ballot. Moreover, in the rerun election, the Union on its own initiative required a member rejected by the committee to obtain only 1,000 petition signatures in order to have his or her name placed on the ballot.
 
 
 10
 The election held pursuant to the court order does not moot this appeal. See Donovan v. Local 120, Laborers' International Union, 683 F.2d 1095, 1098-99 (7th Cir.1982). Instead, determination of the issues raised will provide the Union with guidance in holding future elections, including its regularly scheduled triennial election to be held in June 1985. This appeal presents two questions: first, whether the district court correctly held that Helen Carter had exhausted the remedies available to her under the CSEA Constitution and Bylaws; and if so, whether the district court erred as a matter of law in holding that the CSEA nominating procedures, when considered as a whole, were reasonable.
 
 III. The Exhaustion Requirement
 
 11
 Section 402(a) of the LMRDA provides that before the Secretary may interfere with union election procedures, a union member must have either exhausted his or her union remedies, or invoked them without receiving a final decision for three months. 29 U.S.C. Sec. 482(a).[1] The purpose of the exhaustion requirement is to give a union an opportunity to remedy Title IV violations and thus avoid unnecessary governmental intrusion. Hodgson v. Local 6799, United Steelworkers, 403 U.S. 333, 338-39, 91 S.Ct. 1841, 1845-46, 29 L.Ed.2d 510 (1971). But "any interpretation of the exhaustion requirement must reflect the needs of rank and file union members--those people the requirement is designed ultimately to serve." Id. at 340, 91 S.Ct. at 1846. As a consequence, a heavy burden is imposed on the union to demonstrate that it did not have adequate notice of the protest, keeping in mind that "members should not be held to procedural niceties while seeking redress within their union." Id. at 341 n. 6, 91 S.Ct. at 1846 n. 6.
 
 
 12
 In light of these well-established principles, the district court correctly found that Carter had exhausted her internal union remedies. The trial court observed that Carter had notified the Union of her protest to the nominating procedures prior to the election. Further, it found that Carter's June 25 telegram protest, which is the only one at issue on this appeal, was sent within the ten-day period following the official announcement of the election results, as required by the Union's Constitution and Bylaws. The district court correctly found no merit to the CSEA's contention that it had not received adequate notice because there was no provision for an amended election protest in the constitution. Moreover, the fact that Carter's protest was not sent by certified mail and not received in writing until three days after the expiration of the ten-day period does not defeat her claim. Union members, no matter how well-informed of union appeal procedures, are not dealing with a hostile third party but with their own union which is obligated to consider and decide a member's protest on the merits--not on a legal nicety. See Donovan v. Local 3122, Communications Workers, 740 F.2d 860, 862 (11th Cir.1984) (missed deadline by two or three days was "exceedingly technical violation" not warranting dismissal); Donovan v. Local 1235, International Longshoremen's Association, 715 F.2d 70, 75-76 (3d Cir.1983) (protestors' efforts to examine constitution and bylaws that union said was unavailable excused ten-day compliance); Hodgson v. Liquor Salesmen's Union Local 2, 444 F.2d 1344, 1349-50 (2d Cir.1971) (fact that protest not received in time because of postal strike excused compliance).
 
 IV. Nominating Procedures
 A. Purpose of Title IV of the Act
 
 13
 Section 401(e) of the Act mandates that in union elections subject to the LMRDA:a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject ... to reasonable qualifications uniformly imposed ) and shall have the right to vote for or otherwise support the candidate or candidates of his choice....
 
 
 14
 29 U.S.C. Sec. 481(e) (emphasis added). The determination of whether a particular qualification is reasonable and capable of uniform application under Section 401(e) must be made in light of the purpose of Title IV of the Act. Local 3489, United Steelworkers v. Usery, 429 U.S. 305, 309, 97 S.Ct. 611, 614, 50 L.Ed.2d 502 (1977). The Act's principal aim is to promote democracy in union governance, and the thrust of Title IV is that members be allowed to exercise their own judgment in selecting candidates for office. Wirtz v. Hotel, Motel & Club Employees Union, Local 6, 391 U.S. 492, 504, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763 (1968). Thus, any method of selecting candidates which unduly interferes with members' free choice is unreasonable.
 
 
 15
 Inherent in any organization are factors that impede the exercise of free choice and contribute to the ability of those in power to maintain control. See Summers, Democracy in a One-Party State: Perspectives from Landrum-Griffin, 43 Md.L.Rev. 93, 96-99 (1984). Unlike candidates in a two-party system, those challenging incumbent union leaders are often viewed as disloyal to the union. In addition, control over the union's bureaucracy enjoyed by union leaders gives them an opportunity to perpetuate themselves through the dispensation of patronage. Moreover, power over the channels of communication, while subject to restrictions, is another means of maintaining power. The tight grasp of incumbent leaders should be recognized when a court interprets LMRDA union election requirements so that opposition voices can be heard and their weight felt. Summers, supra, at 99.
 
 
 16
 B. CSEA Nominating Procedures Violate the Act
 
 
 17
 The Union concedes that certain aspects of its nominating procedure are violative of the Act. It has discontinued the automatic placement of incumbents on the ballot. It also agrees that the selection of candidates by the nominating committee, standing alone, violates the Act, but argues that we should adopt the district court finding that the petition alternative makes the nominating procedure reasonable when considered as a whole. We cannot agree. In determining whether the nomination procedure as a whole violates the Act, we first address why use of the nominating committee and its use of subjective criteria, standing alone, violates the Act.
 
 
 18
 The vague and subjective criteria used by the nominating committee members, who are selected solely by the regional executive committees, is a deterrent to potential candidates and inhibits members from exercising their own judgment. The Department of Labor's Regulations expressly distinguish between reasonable qualifications capable of uniform application and qualifications which permit subjective determinations of eligibility:
 
 
 19
 An essential element of reasonableness is adequate advance notice to the membership of the precise terms of the requirement.... Qualifications must be specific and objective. They must contain specific standards of eligibility by which any member can determine in advance whether or not he is qualified to be a candidate.... Further, [a subjective] requirement is by its nature not capable of being uniformly imposed as required by section 401(e).
 
 
 20
 29 C.F.R. Sec. 452.53 (1984). In Local 120, Laborers' International Union, the Seventh Circuit struck down a requirement that an election panel screen candidates for "competency," finding that the requirement "permit[ted] arbitrary and subjective barring of candidates ... [and b]y its nature [could] not be uniformly imposed." 683 F.2d at 1105. The court found that it "discourages potential candidates by its vagueness." Id. at 1104.
 
 
 21
 Moreover, the process results in the substitution of the judgment of committee members for the advised view of the rank-and-file members and thereby leads to the indirect use of prohibited criteria. See Wirtz v. National Maritime Union, 399 F.2d 544, 549-50 (2d Cir.1968). In National Maritime Union, in which the union required candidates to have prior office-holding experience, we said:
 
 
 22
 While we would hesitate to say that experience gained in one of the lower offices bears no relation to a candidate's ability to perform as a national officer, the Supreme Court quite clearly has pointed out that it is for the rank-and-file union members to distinguish qualified from unqualified candidates. It must be left to the judgment of each member to determine in particular instances how much weight to give to prior experience.
 
 
 23
 399 F.2d at 550 (citation omitted).
 
 
 24
 After thoroughly discussing these aspects of the CSEA committee nominating process, the district court held that although the committee process, standing alone, was violative of the Act, the nomination procedure taken as a whole was not. In its view a member's opportunity to gain a place on the ballot by obtaining the required number of signatures provided a reasonable opportunity to nominate candidates and therefore made the nomination procedure reasonable as a whole. In our view the petition requirement does not save the nominating procedure. When the petition requirement is used in conjunction with the committee nominating process the nominating procedure as a whole violates the Act because it fails to comply with the requirement that qualifications be uniformly imposed.
 
 
 25
 In light of the rule that "qualification" requirements must be uniformly imposed under Sec. 401(e) of the Act, 29 U.S.C. Sec. 481(e), the petition requirement violates the LMRDA because it imposes a significant burden not imposed on those selected by the committee. See National Maritime Union, 399 F.2d at 548 (the petition requirement violated the Act because it "was not uniformly imposed since only anti-administration candidates were obliged personally to secure the forms and endorsements"). Scrutiny of such burdens is especially critical on account of the advantage that incumbents or committee-selectees naturally enjoy relative to rank-and-file members. Union officers are rarely unseated, and when such an upset does occur, it is generally one of the union hierarchy and not a rank-and-file member who takes the prize.
 
 
 26
 In addition to finding the procedure as a whole violative of the Act because the petition alternative is not capable of being uniformly imposed, we find the 3800-signature petition requirement itself unreasonable under the facts of this case. We recognize that the use of petitions is expressly recognized under the Department of Labor's Regulations as a permissible means of nomination. See 29 C.F.R. Sec. 452.57.[2] But any petition requirement must still be tested for reasonableness. 29 U.S.C. Sec. 481(e). In making such a case-by-case assessment, requirements under other union constitutions and the geographical distribution of the subject union's membership are relevant criteria.
 
 
 27
 Upon examining the petition requirement of other unions, we find that only a few pre- and post-LMRDA union constitutions have such a requirement. U.S. Department of Labor, Union Constitution Provisions: Election and Tenure of National and International Union Officers 7 (1958); U.S. Department of Labor, Union Constitutions and the Election of Local Union Officers 52 (1965). This small number includes those constitutions requiring endorsement by a specified number of members at a nominating meeting or by a specified number of locals. A scan of the distribution of CSEA membership, as noted earlier, reveals that most CSEA locals have fewer than 500 members and the average local has far fewer. In order to obtain 3,800 signatures from members in good standing, a potential candidate would have to obtain the signature of every member in at least seven locals. As a matter of law, this requires more than a showing of minimal support. See National Maritime Union, 399 F.2d at 548 (petition requirement held unreasonable where many members served in ships at sea even though fewer than 100 needed to endorse candidate for national office). At the same time, the 1,000 petition signatures required by the Union in its rerun election is not unreasonable as a matter of law.
 
 
 28
 In arguing that requiring 3,800 signatures is reasonable, the CSEA points to the affidavit of a member who had been rejected by the committee but who nonetheless succeeded in obtaining 3,800 signatures, and in fact, unseated the incumbent. That member was able to collect over 5,000 signatures by sending petitions to local presidents and treasurers, and to members of the CSEA Board of Directors. While it is to the credit of that particular member to have mounted a successful campaign, we note that she was a union member of long-standing, who had served in numerous leadership positions in her local and region, and had been a state convention delegate and served on various CSEA committees. This activity provided her with extensive contacts among union leadership throughout the state. Her success simply illustrates that on those rare occasions when there is a turnover in a leadership position, the successful challenger is usually from the union hierarchy and not from the membership of the rank and file. Although experience and demonstrated leadership at a local or regional level is an important factor for a voting union member to consider, it may not--consistent with the purpose of Title IV--give an individual a significant advantage in seeking the nomination.
 
 V. Remedy
 
 29
 We come to the remaining question. What is the remedy? The Secretary urges that the case be remanded to the district court with directions that it order the CSEA to conduct another rerun election under his supervision. The Secretary seeks to have a second supervised election despite the fact that the first rerun of the 1982 election was held under his supervision where he found no violations that may have affected the outcome of that election. We see no point in repetition. In the interest of finality of election results, one rerun is enough. Further, supervised rerun elections are costly and disruptive to a union. Although the parties agree that the propriety of the CSEA's 1982 nominating procedures was not mooted by the supervised rerun election, that election limits the relief we may order. See Local 120, Laborers' International Union, 683 F.2d at 1098-99. Thus, while the disposition of this appeal does not affect the results of the supervised election, our determination will be applicable to the regularly scheduled June 1985 election and to future elections.
 
 
 30
 Accordingly, the district court order is affirmed insofar as it concluded that Helen Carter had exhausted her internal union administrative remedies. Insofar as the district court found the CSEA nominating procedures reasonable and not in violation of the 1959 Act, the order appealed from is reversed and the case is remanded to the district court with directions to enter an order consistent with this opinion including in particular a provision that 1,000 signatures on a candidate's petition for CSEA statewide office are sufficient.
 
 
 
 [1]
 Section 402(a) of the Act, 29 U.S.C. Sec. 482(a), provides:
 A member of a labor organization--
 (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
 (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
 may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title....
 
 
 [2]
 Section 452.57 Procedures for Nomination
 (a) Since the Act does not prescribe particular procedures for the nomination of candidates, the labor organization is free to employ any method that will provide a reasonable opportunity for making nominations. There are various methods which, if properly and fairly employed, would be considered reasonable under the Act. For example, nominations may be by petition, or from the floor at a nomination meeting.
 (b) Whether a particular procedure is sufficient to satisfy the requirements of the Act is a question which will depend upon the particular facts in each case. While a particular procedure may not on its face violate the requirements of the Act, its application in a given instance may make nomination so difficult as to deny the members a reasonable opportunity to nominate.
 
 
 [29]
 C.F.R. Sec. 452.57 (1984)