**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**LOCAL UNION 226, HOTEL & RESTAURANT EMPLOYEES, Defendant.**

**No. CV–S–87–934–RDF.**

United States District Court, D. Nevada.

July 10, 1989.

William A. Maddox, U.S. Atty., Ruth L. Cohen, Asst. U.S. Atty., Las Vegas, Nev., Daniel Teehan, George R. Salem, Regional Sol. (Steven R. DeSmith, U.S. Dept. of Labor, of counsel), San Francisco, Cal., for plaintiff.

Richard G. McCracken, Davis, Cowell & Bowe, San Francisco, Cal., for defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

ROGER D. FOLEY, Senior District Judge.

This matter is before the court on cross-motions for summary judgment. The Secretary of Labor seeks judgment declaring void the May 19, 1987 election of officers conducted by Local 226 of the Hotel and Restaurant Employees Union, and ordering a new election under the Secretary's supervision. The Secretary alleges campaign violations under Title IV, section 401(g) of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA or the Act), 29 U.S.C. § 481(g) (1982), and seeks this court's intervention pursuant to the enforcement provisions of the Act, 29 U.S.C. § 482(c)(2).

This case presents a novel question of law which has not yet been addressed by the courts. In a union election involving four slates of candidates for union offices, one of the insurgent slates won the race and another insurgent slate claimed foul alleging that the losing incumbent slate violated campaign rules. The Secretary of Labor now seeks to nullify the election arguing that the losing incumbent slate's cheating may have affected the outcome of the election. The issue is one of first impression.

## I. *Facts*

Local 226 represents approximately 24,000 service employees at hotels in Las Vegas and Tonopah.[1] An election for the offices of Secretary–Treasurer, President, and Vice–President was held on May 19, 1987. Four slates of candidates campaigned for these positions. Each slate is known by the name of its respective candidate for secretary-treasurer, the chief executive officer of the union.

The Michael's slate (Denis Michaels, Rachael Coleman, and Joe Hayes) consisted of incumbent officers of Local 226. Three slates consisting of union members who were not officers of Local 226 challenged the incumbents. Those slates were the Arnold slate (Jim Arnold, George Williams, and Joe Tadaro), the Caldaro slate (Benedict Caldaro, Harold Miller, and Melvin Eisner), and the Ryff slate (Bill Ryff, Angel Ramirez, and Annie Mae Carr).

The candidates each received the following number of votes:

Secretary–Treasurer

| | | | |
|---|---|---|---|
| (1) | Arnold | | 1664 votes |
| (2) | Michaels | (incumbent) | 1275 votes |
| (3) | Caldaro | | 740 votes |
| (4) | Ryff | | 630 votes |

President

| | | | |
|---|---|---|---|
| (1) | Williams | (Arnold slate) | 1705 votes |
| (2) | Coleman | (Michaels slate) | 1058 votes |
| (3) | Miller | (Caldero slate) | 699 votes |
| (4) | Ramirez | (Ryff slate) | 698 votes |
| (5) | Darata | (independent) | 18 votes |

Vice–President

| | | | |
|---|---|---|---|
| (1) | Tadaro | (Arnold slate) | 1661 votes |
| (2) | Hays | (Michaels slate) | 1468 votes |
| (3) | Eisner | (Caldero slate) | 581 votes |
| (4) | Carr (Ryff slate) | | 566 votes |

In addition to the slate of prospective officers, eleven candidates ran for three Trustee positions and twenty-one candidates ran for five positions on the Executive Board. The total number of votes cast for the Secretary–Treasurer position was

---

**1.** Crafts represented by the union include maids and other housekeeping employees, porters, kitchen and serving staff, cocktail and food servers, hostesses, bell captains and baggage handlers, cashiers, checkers and change personnel, guestroom attendants, valets, and others.

4,309. Following the election, the results were certified and posted on May 20, 1987.

Soon afterward, Stephen LaFargue, a union member who supported the Caldero slate, sent a letter, dated May 27, 1987, to the union protesting the election and alleging several campaign violations by the Michaels slate. Subsequent to an internal investigation, the union responded by letter in which it denied improprieties justifying overturning the election results. Thereafter, LaFargue filed a complaint with the Secretary of Labor. Another investigation was performed by the Secretary who then determined that probable cause existed to believe violations of election rules occurred. The Secretary then filed this complaint challenging the legality of the election.

## II. *Burden of Proof*

Section 401(g), 29 U.S.C. § 481(g), states:

No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title.... Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

The appropriate interpretation of this statutory provision is a primary issue on which the parties disagree. If the court finds a violation of section 401(g) and determines that the violation "may have affected the outcome of the election," the court is empowered to nullify the election and order the union to hold a new election under the supervision of the Secretary. Section

402(c), 29 U.S.C. § 482(c), of the LMRDA provides:

If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

. . . .

(2) that the violation of section 401 [29 U.S.C. § 481] may have affected the outcome of an election,

the court shall declare the election, if any, to be void and direct the conduct of a new election under the supervision of the Secretary....

The Secretary can establish a prima facie case of an adverse affect on the election by showing that a campaign violation occurred. If the facts support a finding of any of the alleged violations, then the Secretary has established her prima facie case. *Wirtz v. Hotel, Motel and Club Emp. U., Local 6,* 391 U.S. 492, 506–507, 88 S.Ct. 1743, 1752, 20 L.Ed.2d 763 (1968). The union must then present evidence disproving the inference that the violation affected the outcome. *Id.*[2]

## III. *Whether Violations of Section 401(g) Occurred*

The Secretary alleges that the losing incumbent officers of the Michaels slate violated section 401(g) of the LMRDA in three distinct ways. First, the Secretary contends that union business agents campaigned for the Michaels slate on union time. Second, the Secretary contends that union business agents campaigned for the Michaels slate and took the Michaels slate candidates into the back areas of hotels which are closed to public access. Finally, the Secretary contends that union money was used to purchase campaign flyers and other materials for the Michaels slate.

**2.** As a preliminary matter, the union contends the complaint filed by LaFargue was untimely because it was mailed on the deadline for filing a complaint and was not actually received by the union until several days after the deadline had passed. If the complaint was untimely then LaFargue failed to exhaust his administrative remedy as required by section 402 of the LMRDA. 29 U.S.C. § 482. The federal courts, however, are very lenient in their interpretation of the exhaustion clause. Ultimately, the union is supposed to support its members and is

"obliged to consider a member's protest on the merits—not on legal nicety." *Donovan v. CSEA Local 1000, American Fed'n of State, County and Municipal Emp.,* 761 F.2d 870, 875 (2d Cir.1965) (date of mailing will be considered in determining whether the complaint was timely). *See also Donovan v. Local 3122, Communication Workers of America,* 740 F.2d 860, 862 (11th Cir.1984) (three days beyond the deadline is not fatal especially where the complaint was mailed before the deadline). Therefore, the court finds that the complaint was timely presented.

### A. Union Employees Campaigned On Union Time

The Secretary alleges that union employees campaigned for the Michaels slate during union hours, while they were being paid by the union. Union business agent Carolyn Taylor has stated that she promoted the Michaels slate at the union hall and during her visits to hotels, while she was being paid by the union. Doc. # 16, Exh. C at 19–24 and 34–35. Taylor contacted union members and urged them to vote for the Michaels slate, Doc. # 16, Exh. C at 19, and distributed campaign literature during regular business visits to her assigned hotels, *id.* at 19–24, 34–35. In addition, Taylor escorted Michaels and Hays through the hotels to solicit votes. Doc. # 16, Exhs. C at 21–25 and G at 19–21.

Rachael Coleman has also admitted to promoting her candidacy by campaigning from her union hall office during time she was being paid by the union as a business agent supervisor. Doc. 16, Exh. G at 23. Additionally, Coleman promoted her slate by campaigning during union business hours in the "back end," *i.e.*, the non-public area, of hotels which she supervised. Doc. 16, Exh. G at 15–23, 29–30, and 32–34.

Candidate Joe Hays has also admitted to being escorted by Taylor through the back end of hotels and to campaigning at the hotels past 8:00 a.m. when his regular job as union President began each day. Doc. # 16, Exh. J at ¶ 4. The union has not countered any of the above stated testimony.

Section 401(g) prohibits the expenditure of union money for campaign purposes. The Secretary has interpreted this statute to mean that union employees who campaign on union time constitutes an expenditure of union funds for campaign purposes. 29 U.S.C. § 481(g); 29 C.F.R. § 452.76 (officers and employees of union cannot campaign during times when they are being paid by the union).

The Secretary's interpretive regulations of section 401(g) are given considerable weight by the courts. *See BLE Intern. Reform Comm. v. Sytsma,* 802 F.2d 180, 190 (6th Cir.1986); *Alvey v. General Elec., Co.,* 622 F.2d 1279, 1286 n. 7 (7th Cir.1980). *See also United Steelworkers of America, AFL–CIO v. Sadlowski,* 457 U.S. 102, 114, 102 S.Ct. 2339, 2347, 72 L.Ed.2d 707, *reh. denied,* 459 U.S. 899, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982) (quoting with approval 29 C.F.R. § 452.76).

Furthermore, no threshhold value is required to be expended in order to violate section 401(g). In *Donovan v. Local 70, Intern. Broth. of Teamsters, Chauffers, Warehouseman, and Helpers of America,* 661 F.2d 1199, 1202 (9th Cir.1981), the Ninth Circuit Court of Appeals stated: "'Moneys,' as used within § 401(g), has been interpreted as anything of value, whether the expenditure be direct or indirect." *Id.* (campaign literature posted on employer's notice board constituted use of employer funds for campaign purposes).

In another Ninth Circuit decision, the court found that the value of the alleged violations was $13.04. *Schultz v. Local U. 6799, United Steelworkers of America,* 426 F.2d 969 (9th Cir.1970), *aff'd on other grounds sub nom., Hodgson v. Local 6799, United Steelworkers of America,* 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971). The court nevertheless found that expenditure of such a minimal amount "reflected the outlay of a sensible sum of union money" and violated section 401(g). *Id.* 426 F.2d at 972.[3]

■ Thus, in this case, as in the previously cited cases, the court finds that section 401(g) was violated when members of the incumbent slate and other union em-

---

**3.** In refusing to adopt a *de minimis* standard, the court stated:

> The legislative history of the Act does not indicate that Congress intended to place a limit on the amount that a union might lawfully spend to aid a candidate for office or that it meant to encourage troublesome factu-

al disputes over how much (or little) money constitutes a "de minimis" amount; and the language of the provision itself is clear and unambiguous. It provides in terms that "no moneys" of a union shall be spent to promote the candidacy of any person for union office. *Shultz v. AFL CIO, Local 6799,* 426 F.2d at 972.

ployees campaigned during times they were being paid by the union.

### B. Business Agents Used Their Status To Gain Candidate Access To Restricted Areas of Hotels

Several union business agents used their official positions to gain access for themselves and candidates of the Michaels slate to the back end of hotels. The back ends are non-public areas, solely used for hotel employees. At least three union business agents (Jim Bonaventure, Maria Briesacher, and Maria Cross) have stated that they took members of the Michaels slate into the back end of hotels so that the slate members could campaign. Doc. # 16, Exhs. E at 19–30, 32–33, and 35–37, F at 28–33 and 36–39, and D at 13–20.

The Secretary argues that in using their official union positions to obtain access to the back ends for campaign purposes, the business agents, thus the union, contributed something of value to the Michaels slate.[4] Other candidates did not have the same access to union members as did members of the Michaels slate. Although three of the twenty-two business agents supported the Arnold slate, there is no evidence that those three business agents used their union position to gain access for candidates whom they supported.[5] The evidence presented shows that the members of the Michaels slate were the only persons who utilized business agents to obtain access to restricted areas of an employer's business.

**4.** The Secretary argues further that use of the back ends for campaign purposes constitutes use of employer funds in contravention of section 401(g). Doc. # 16 at 22. It is not necessary for the court to decide this issue because, as explained above, use of union position to gain access to restricted areas is an expenditure of union funds and violates section 401(g). The court, however, does not determine whether equal access to the back ends by all of the candidates would constitute a violation of section 401(g). That question is best left for another day.

**5.** None of the union's business agents supported the Caldero or Ryff slates, nevertheless those candidates did obtain access to the back end of some of the hotels. In his affidavit, Caldaro states that he campaigned in the back end of

As previously noted, the Ninth Circuit has interpreted "moneys," as used within section 401(g), to mean "anything of value, whether the expenditure be direct or indirect." *Donovan v. Local 70, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 661 F.2d at 1202 (posting campaign literature on employer's bulletin board constituted use of employer funds in violation of the LMRDA). *See also Donovan v. Metropolitan Dist. Council of Carpenters,* 797 F.2d 140, 145 (3rd Cir.1986) (contributions of any size or kind are prohibited). As noted in *Schultz v. Local 6799, United Steelworkers of America,* 426 F.2d at 972, "the object of the section is to prohibit discrimination between candidates."

Additionally, the Supreme Court has held that union officials do not have the same rights as employees to distribute literature on employer premises. *Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978); *Central Hardware Co. v. NLRB,* 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972). While union officials have the right to enter employer premises to meet with union members, those entry rights are limited to visits necessary to conduct official union business. *NLRB v. Villa Avila,* 673 F.2d 281 (9th Cir.1982).

Although no case has held that use of union status to obtain incumbent access to non-public areas of an employer's property without providing the same access to all candidates violates section 401(g), such a holding is consistent with the purpose

Caesars Palace and the Tropicana Hotel. Doc. # 16, Exh. I. Likewise, Ryff admits to having campaigned in the back end of the Barbary Coast, the Dunes, and the Sands Hotels. Doc. # 16, Exh. H. Ironically, only the election winner, Arnold, appears to have refrained from campaigning in the non-public areas of the hotels.

Nonetheless, since only members of the Michaels slate were accompanied by business agents, they were the only ones cloaked in official union approval which allowed them access while the other candidates were generally prevented from campaigning in those areas. *See* Doc. # 16, Exh. H & I (Ryff and Caldaro state that they were removed from the back end of several hotels).

behind the LMRDA. *See Wirtz v. Hotel, Motel and Club Emp. U., Local 6,* 391 U.S. at 497–498, 88 S.Ct. at 1746–47 (Congress sought to reduce union "corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct"). Thus, the court finds that business agents who use their official status to obtain candidate access to non-public areas of an employer's business, while not providing the same access to all candidates, have given value. As such, the business agent's actions violate section 401(g).[6]

### C. Union Funds Were Used To Purchase Campaign Materials

While still in office, Michaels directed Creel Printing Company to print 22,500 flyers, 10,000 brochures, and 18,000 sample ballots which were marked for the Michaels slate. Doc. # 16, Exh. L at ¶ 3; Doc. # 16, Exh. N, depo. exhs. 2, 5, 9, 10, 12, 14, 16, 20, 21, and 28. The total cost for Creel Printing's services was $6,985.40. Doc. # 16, Exh. N, depo. exhs. 3, 7, 10, 14, 18, 22, 26, 29.

■ After the election, the Arnold slate took office and began paying bills. Creel Printing had sent the invoices for the Michaels slate printing job to the union for payment. The union, at Arnold's direction, paid $1,632.40 on two invoices. Doc. # 16, Exh. O. Later, Arnold learned that the invoices were for Michaels' campaign materials so he sought and obtained reimbursement from Michaels. Doc. # 19, ¶ 8. The remaining invoices for Michaels' campaign materials remain unpaid. Doc. # 16, Exh. N at 42–45 and depo. exh. 30. The union claims that the new officers mistakenly used union funds to pay printing costs of the incumbents' campaign flyers and a mistake such as this does not violate section 401(g). The Secretary counters arguing that intent is not needed to prove a section 401(g) violation. The Secretary is correct.

Section 401(g) clearly states that no money may be used to promote a candidate. Whenever union funds are used for campaign expenses, a violation has occurred. Indeed, no other result is possible. Accepting the union's argument would allow candidates to use union funds and repay the union only if the Secretary found out and sought to annul the election. Mistake could often be used as a defense to the use of union funds for campaign purposes. To allow that to occur would defeat the purpose of the LMRDA. Thus, a violation of section 401(g) occurred when the election victors mistakenly used union funds to pay campaign printing bills incurred by the losing incumbents. *See Donovan v. Local Union 70,* 661 F.2d at 1201 (use of trailer as billboard for campaign posters, even without the employer's knowledge or intent, was a violation).

### IV. Whether the Violations of Section 401(g) May Have Affected the Outcome of the Election

The Secretary has proven that violations occurred during the election campaign of 1987. Thus, a prima facie case exists that the violations may have affected the outcome of the election. The prima facie case presumes that there is a "meaningful relation" between the violations and the election results. *Wirtz v. Hotel, Motel and Club Emp. U., Local 6 Union,* 391 U.S. at 507, 88 S.Ct. at 1752. The union can overcome this prima facie case by demonstrating that the violations did not affect the election results. *Id.* Logical inferences from the facts may be drawn by the court. *Id.* at 508, 88 S.Ct. at 1752.

Initially, the union cites an Eighth Circuit case which is different from this case in only one respect. In *Usery v. Stove, Furnace & Allied Appliance Workers, Intern. U. of America,* 547 F.2d 1043 (8th Cir.1977), the Secretary sued to nullify a union election because the incumbents used union assets to further their candidacies.

---

**6.** The court specifically refrains from determining whether employer funds were unlawfully used to further an incumbant candidate because the court finds that union officials' access to the back end of hotels to campaign for office constitutes value given by the union. Under different circumstances, perhaps campaigning in the back end of hotels is appropriate so long as all candidates have equal access. There is no need, however, to determine the issue here.

The union assets supported the union's newspaper which carried an endorsement of a slate of candidates. Each candidate endorsed by the paper won his position except one position which was won by an insurgent candidate not endorsed by the paper. The court nullified the election except as to the one insurgent candidate. The court explained:

> Considering each of the offices individually, we are unable to find any reason for setting aside the election of Thomas Kemme as Fourth Vice President. Both Kemme and Richard J. Bacher were nominated for that position. Bacher was one of those recommended by the retiring president. Notwithstanding that recommendation, Kemme won the election by a vote of one hundred and four to ninety-two. The Secretary of Labor did not challenge Kemme's election because, in his view, the election was not affected by the violation. The District Court, as we indicated above, set the election aside on the theory that a violation which affects the election for one office voids the entire election. We agree with the Secretary of Labor and reverse the trial court. It would be totally inconsistent with the language and history of the Act to deprive Kemme of an office which he won on his own.

*Id.* at 1047.

The difference between this case and *Usery* is that only two candidates ran against each other in the contested race in *Usery* whereas four slates of candidates ran against each other in the election held by Local 226. The Secretary argues that although an innocent insurgent slate won the election, two other innocent insurgent slates lost the election and may have been adversely affected by the campaign violations of the losing incumbents. The court does not accept the Secretary's argument.

■ As the court in *Usery* stated, it is "inconsistent with the language and history of the Act to deprive" an innocent insurgent candidate "of an office which he won

on his own." *Id.* One of the objectives Congress sought to achieve in passing the LMRDA was free and democratic elections. *Marshall v. Local 1010, United Steelworkers of America,* 664 F.2d 144, 150 (7th Cir.1981). To the extent, if any, which the violations of the LMRDA were felt, they were felt by all of the insurgent candidates, not just the losing insurgent candidates. A fair inference from the election results is that the effect of the violations was the same on all candidates and that the union members intended to throw out the cheating incumbents and replace them with a slate of innocent insurgents.

This inference actually supports the Congressional goal of democratic elections, *id.,* and adequately considers the caution contained in the Senate Report recommending passage of the LMRDA that "[i]n providing remedies for existing evils the Senate should be careful [not] to undermine self-government within the labor movement...." S.Rep. No. 187, 86th Cong., 1st Sess. 4, *reprinted in* 1959 U.S.CODE CONG. & ADMIN.NEWS 2318, 2322; *see also Wirtz v. Hotel, Motel and Club U., Local 6,* 391 U.S. at 496, 88 S.Ct. at 1746 (court discusses balancing the union's right to self-government against the public interest in guaranteeing democratic elections). The court believes that allowing actions of incumbents to serve as the basis for removing from office innocent insurgent candidates gives undue power to incumbents and will only serve to undermine self-government by the union rank and file.[7]

In addition, Congress sought to achieve three other objectives upon passage of the LMRDA: (1) to " 'prevent, discourage, and make unprofitable' improper conduct by union officials"; (2) to curb abuse by "entrenched" union leadership; and (3) to encourage challenges to "entrenched" union leadership. *Marshall v. Local 1010, United Steelworkers of America,* 664 F.2d at 150. This court will not further the goals of Congress by nullifying an election in

---

**7.** The court takes special notice of the fact that there is no allegation of collusion between the losing incumbents and the winning insurgents.

Obviously, such an allegation would have significant ramifications on the court's position.

which insurgent candidates, who ran a clean campaign, were elected into office.

The *Marshall* case is in accord with this court's position. In *Marshall*, the incumbent union officials violated campaign rules after recognizing imminent defeat and then attempted to invalidate the election which they lost in order to give themselves another chance at retaining their positions by forcing a second election. The Seventh Circuit rejected this action stating that "[w]here, as here, granting the remedy the Secretary requests would have the perverse result of encouraging and rewarding deliberate violations of the LMRDA election rules the district court has the power to withhold that remedy [of nullifying the election]." *Id.* at 152.

The same perverse result which would have occurred in *Marshall* had the court nullified the election will occur here if this court nullifies the 1987 election held by Local 226. The incumbent candidates cheated and lost. To nullify the election now will only provide a second opportunity for the incumbents to retain their offices. This cannot be Congress's intent.

Furthermore, in order for the outcome of the election to have changed, well over four-fifths of the votes cast for the Michaels slate would have had to vote as a block for the Caldaro slate or the Ryff slate in order to allow one or the other to surpass the number of votes garnered by the Arnold slate. This is not a reasonable inference of the effect of the violations by the incumbent slate. A more likely inference is that some, but by no means all, of the votes cast for the Michaels slate would switch to each of the three slates of insurgent candidates. Thus, the court finds that no effect on the outcome of the election resulted from the violations of the losing incumbents and the purpose of the LMRDA would be violated if the court were to nullify this election under these circumstances.

Notwithstanding the fact that the incumbents lost the election at issue here, the court is concerned with evidence presented suggesting that the violations which occurred in this election also occurred in prior elections. In fact, one business agent testified during her deposition that it was common practice to do some of the acts which this court today finds violative of the LMRDA. Doc. # 16, Exh. C at 20, 29–31. The union has suggested that the court direct the Secretary of Labor to oversee the next regularly scheduled election of officers. This suggestion is wisely presented and the court prudently adopts it as part of this opinion pursuant to its power to fashion a just remedy. *See Usery v. Stove, Furnace & Allied Appliance Workers Intern. U. of North America,* 547 F.2d at 1047.

### V. *Conclusion*

Although campaign violations were committed by the incumbent officers of Local 226, the court finds that it would contravene the purposes of the LMRDA to nullify the election in which innocent insurgents gained political office. Furthermore, the court finds that the violations affected all insurgent candidates similarly and that the vote count was such that a reasonable inference suggests that the violations did not affect the results of the election. Thus, the election results will not be disturbed.

Nevertheless, the Secretary of Labor is directed to oversee the next regularly scheduled election in order to ensure that the new incumbents successfully avoid the campaign violation pitfall where their predecessors seem to have resided.